UNITED STATES of America, Appellee,

v.

Marvin KAPLAN, Defendant–Appellant.

No. 108, Dockets 87–1137, 87–1134(L).

United States Court of Appeals,
Second Circuit.

Submitted Feb. 10, 1989.

Decided Oct. 3, 1989.

Gerald B. Lefcourt, New York City (Walter P. Loughlin, Newark, N.J., Joshua L. Dratel, New York City, of counsel), for defendant-appellant.

Michele Hirshman, Asst. U.S. Atty. for S.D.N.Y. (Benito Romano, U.S. Atty. for S.D.N.Y., Kerri Martin Bartlett, Asst. U.S.

Atty., New York City, of counsel), for appellee.

Before CARDAMONE, WINTER and PRATT, Circuit Judges.

WINTER, Circuit Judge:

This appeal presents the now familiar but still vexing issue of what constitutes sufficient evidence to support a finding of a "pattern of racketeering activity" under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 (1982 & Supp. V 1987). Many aspects of this case have already been decided in *United States v. Friedman*, 854 F.2d 535 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989), familiarity with which is assumed. In *Friedman*, however, we reserved decision on appellant Kaplan's RICO convictions so that we might have the benefit of the teaching of our en banc decisions in *United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc), and *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir.1989) (en banc), *vacated for further consideration*, —— U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), *upheld* by order of Sept. 15, 1989. We have also since been informed by the decision in *H.J. Inc. v. Northwestern Bell Telephone*, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Upon the Supreme Court's remand of *Beauford* to this court for reconsideration in light of *H.J. Inc.*, we have adhered to our en banc decision, and its reasoning fully governs this case. After supplemental briefing by the parties, we conclude that the evidence against Kaplan was sufficient to support a finding of a pattern of racketeering activity because Kaplan committed the requisite two racketeering acts and his activities regarding the enterprise in question, viewed as a whole, indicated that those acts posed a threat of continuing racketeering activity.

## BACKGROUND

We of course view the evidence in the light most favorable to the government. Although Kaplan's role in the corruption that pervaded the New York City Parking Violations Bureau ("PVB") is described in detail in *Friedman*, we briefly recount the relevant facts here. Along with several partners, Kaplan owned and operated a number of computer-service companies known as the "Kaplan Group." Kaplan Group firms supplied data processing services, including the keypunching of parking and other types of tickets, for municipalities throughout the Northeast. Around 1979, Data Conversion Corporation, a Kaplan Group company, was awarded a contract to perform the microfilming of parking tickets and the manual entry of information from parking tickets into the PVB computer. In the early 1980's, the PVB considered switching to a system of handheld computers, a move that would eliminate the need for keypunching. Fearing the loss of business, Kaplan and his partners sought to preserve their position by developing their own hand-held computer. To that end, they enlisted the help of the politically influential Stanley Friedman as a consultant. 854 F.2d at 547–48.

During the spring of 1982, Friedman arranged a meeting attended by Kaplan, Geoffrey Lindenauer, an assistant director in the PVB who owed his position to corrupt Queens borough president Donald Manes, Lawrence Yermack, the Deputy Commissioner of the Department of Transportation, and Friedman himself in his capacity as a lobbyist for the Kaplan Group. At the meeting, Kaplan tried to persuade Lindenauer to award the Kaplan Group a contract to carry out a pilot project to develop a hand-held computer. Kaplan failed in this attempt to obtain a "sole-source" contract and was told that the contract for the computer would be awarded through competitive bidding. *Id.* at 548.

Kaplan met with Lindenauer a few days later. He told Lindenauer that he would give Lindenauer and Manes each $500,000 worth of stock in Citisource, a Kaplan Group company formed to develop the hand-held computer, in return for their assistance in securing the contract. *Id.* at 548, 557. Manes, then a political power in New York City, was a member of the Board of Estimate, whose approval of the

contract would be necessary. Kaplan knew that Manes could play a key role in securing that approval. *Id.* at 558–59.

When Lindenauer reported Kaplan's offer to Manes, Manes agreed but expressed concern over who would hold the stock. *Id.* at 557. After deciding that Friedman should hold the stock, Manes instructed Lindenauer to report back to Kaplan that they accepted his proposal and would do everything in their power to ensure that Kaplan won the contract. *Id.* at 558. Soon thereafter, Lindenauer asked Friedman to hold the stock in three blocks, one each for Manes, Lindenauer and Friedman. Friedman agreed. *Id.* at 548.

New York City municipal agencies solicit competitive bids by issuing "requests for proposals" ("RFPs") that provide specifications for the contracts to be awarded. *Id.* at 548. During the months following the bribes, Robert Richards, an investment partner of Kaplan, *id.* at 548, who was to serve as president of Citisource, helped Lindenauer draft an RFP for the hand-held computer with terms ideally suited to the capabilities of the Kaplan Group. *Id.* at 548, 558. In responding to the RFP, Citisource, whose chairman was Kaplan, stated that Friedman was "special counsel" to the company, but, at Kaplan's insistence, omitted Friedman from its list of prospective major shareholders. *Id.* at 549. During the selection process, Lindenauer diligently attempted to skew the PVB's comparative evaluations of the bids in favor of Citisource. He also expressed concern to Kaplan, Friedman and Richards that the Kaplan Group perform its side of the bargain, including issuing and distributing the Citisource stock before the selection committee's vote. *Id.* at 549, 558.

In April 1983, Citisource issued its stock to Friedman to be held in three equal blocks for himself, Lindenauer and Manes. In June 1983, the selection committee voted unanimously to award the contract to Citisource, but only after Lindenauer lied to assuage concerns raised in the committee about Citisource. In early 1984, when the Kaplan Group wanted to sell Citisource stock to the public to raise capital for the development of the hand-held computer, it was hampered by the fact that its sole asset was merely the prospect of obtaining a PVB contract. Friedman, while continuing to conceal his ownership of Citisource stock, then used his influence to expedite consideration of Citisource's proposed contract before the Board of Estimate. The Board of Estimate approved the contract at the end of June 1984, and, soon thereafter, Citisource signed a contract with the City worth approximately $22 million. *Id.* at 549.

Kaplan's involvement in the corruption pervading the PVB extended beyond the Citisource contract. Joseph Delario, a close friend of Kaplan, headed a data-processing firm, Datacom, which also used bribes in doing business with the PVB. *Id.* at 544. In late 1982, Delario was looking for a new consultant to smooth over certain problems with Lindenauer and the PVB and to ensure that Datacom would retain two lucrative contracts, concerning out-of-state towing and collection, up for renewal in 1983. Satisfied with the bribe-brokering services of Friedman with respect to Citisource, Kaplan suggested to Delario that Datacom retain Friedman. Delario was eager to do so, but feared that if he paid Friedman's requested fee of $150,000 to $200,000 openly, new investors in Datacom would object. Delario then enlisted Kaplan's help in using one of Kaplan's companies, Data Conversion, for which Datacom performed services, to launder the payments. Delario suggested that Data Conversion divert funds it owed to Datacom to pay Friedman's fee, thus allowing Datacom to compensate Friedman without the transaction appearing on Datacom's books. Kaplan agreed, and over the next two years, Kaplan's company, Data Conversion, issued checks to Friedman totalling more than $200,000. *Id.* at 550.

Kaplan played an additional role in funneling money to Friedman for Friedman's help in obtaining a profitable contract for Datacom on a new in-state vehicle towing plan, which would become practical through the use of hand-held computers to identify vehicles. Datacom and several other companies negotiated a corrupt joint

venture, called the Bernard Joint Venture ("BJV"), to divvy up the spoils of the new towing contract. Under the arrangement, the BJV would run the towing program and would retain Datacom as a subcontractor to do the towing for a percentage of the commissions received by the BJV. *Id.* at 550–51.

Friedman negotiated for himself a fee of one percent of the total collections generated by the BJV. Because of publicity stemming from the recent disclosure of his ownership of Citisource stock, Friedman wanted his fee laundered through a third party. Friedman and Delario sought the assistance of their mutual friend Kaplan, who was of course already laundering Datacom fees for Friedman. Kaplan agreed to pass Friedman's fee through Desu Consulting and Leasing, a Kaplan Group firm. In late January 1985, Delario and Kaplan reduced this understanding to writing, under which Datacom agreed to pay Delario one percent of the total commissions of the BJV, purportedly for providing data-processing services, but in reality to compensate Friedman for his services as a bribe-broker. *Id.* at 551.

The evidence at trial revealed Kaplan's further involvement, in mid–1985, in a scheme to obtain a new PVB data-processing contract. Kaplan proposed to Delario that they submit a joint bid in Datacom's name, and then retain a Kaplan Group firm as a subcontractor. Delario sought Friedman's help in assuring Lindenauer's cooperation. To this end Friedman negotiated a deal, to which Kaplan and Delario agreed, under which Lindenauer, Friedman and Manes would divide equally among themselves around ten percent of Datacom's earnings under the proposed contract.

Lindenauer, suspicious of Datacom, demanded a sizeable advance. Delario opposed paying the front money to Lindenauer, but Kaplan, fearful of losing a lucrative contract, told Delario that he was willing to pay Lindenauer $35,000 from one of his companies and would discuss repayment with Delario later. Delario agreed. Kaplan then suggested that Friedman send him a bill for legal services to allow him to

pay the bribe, and Friedman agreed. While Lindenauer worked on securing the contract for Datacom, Delario and Kaplan worked out a phony invoicing scheme for Kaplan to obtain reimbursement from Datacom for advancing Lindenauer the up-front bribe money. The scheme was aborted by revelations of a federal investigation, *id.* at 552, and Kaplan and Delario then engaged in a cover-up of their corrupt activities.

Subsequently, the failure to meet scheduled contract work progress deadlines and the existence of the federal criminal investigation resulted in the City's cancellation of the Citisource contract in January 1986. After a jury trial, Kaplan was convicted of conducting and participating in the affairs of the PVB through a pattern of racketeering activity, in violation of RICO, 18 U.S.C. §§ 1961, 1962(c), on the basis of the bribery of Manes and Lindenauer on Citisource's behalf as the two predicate acts, and of conspiring to commit the RICO violation, 18 U.S.C. §§ 1961, 1962(d).

## DISCUSSION

The sole issue is whether the evidence is sufficient to support a finding that Kaplan engaged in a "pattern of racketeering activity" under RICO, 18 U.S.C. § 1961(5). RICO makes it illegal

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

18 U.S.C. § 1962(c). Section 1961 contains the following definitions of "racketeering activity," "pattern of racketeering activity," and "enterprise":

> (1) "racketeering activity" means (A) any act or threat involving [*inter alia*] murder, kidnaping, gambling, arson, robbery, bribery, extortion, ... which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section

224 (relating to sports bribery), ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), ... section 1952 (relating to racketeering), ...

\* \* \* \* \* \*

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity; ...

18 U.S.C. §§ 1961(1), (4), and (5).

The indictment charged Kaplan with only two predicate racketeering acts, namely the bribes to Lindenauer and to Manes on Citisource's behalf offered by Kaplan in the conversation with Lindenauer. Kaplan's actions in connection with Datacom's out-of-state towing and collection contract, the BJV's in-state towing contract, and Datacom's data-processing contract hopes were not charged as predicate acts. The "enterprise," of course, was the PVB.

### 1. *The "Two–Act" Requirement*

■ In *Friedman*, we concluded that Kaplan's conduct with respect to the Citisource bribes—the predicate "racketeering activity" involved here—constituted more than one "act" for RICO purposes. 854 F.2d at 565–66. To reiterate, in *Friedman* we rejected Kaplan's contention that RICO's two-act requirement was not met because the alleged predicate acts may not have been separately chargeable under state law. Relying on *United States v. Paone*, 782 F.2d 386 (2d Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986), 483 U.S. 1019, 107 S.Ct. 3261, 97 L.Ed.2d 761 (1987), we held that "state procedural rules such as those relied upon by Kaplan are irrelevant under RICO." 854 F.2d at 565. While RICO states that "racketeering activity" includes "any act ... involving ... bribery ... which is chargeable under State law," 18 U.S.C. § 1961(1)(A) (Supp. V 1987), we reiterated that "this language was 'not intend[ed] to incorporate the various states' procedural and evidentiary rules into the RICO statute,' but was instead 'meant to define, in a more genuine sense, the wrongful conduct that constitutes the predicates for a federal racketeering charge.'" 854 F.2d at 565 (quoting *Paone*, 782 F.2d at 393). A contrary reading of the statute "'would result in precisely the same criminal act, proscribed by the laws of two states, being the basis of a RICO violation in one state but not in the other—simply because of differences in what are essentially procedural rules.'" *Id.* at 566 (quoting *Paone*, 782 F.2d at 393).

Beginning with the proposition that state procedural rules "do not affect the generic definition of the crime of bribery," *id.*, we reasoned that

[T]he bribe to Lindenauer was chargeable and punishable under New York law, as was the bribe to Manes. Each was thus a bribe under New York's definition of bribery, even though they both could not be (we assume ...) separately charged and punished. Because the definition of bribery is unaffected, the two bribes to Manes and Lindenauer remain "chargeable under State law and punishable" for the purposes of RICO and constitute separate predicate crimes. *See United States v. Licavoli*, 725 F.2d 1040, 1046–47 (6th Cir.), ..., *cert. denied*, 467 U.S. 1252 [104 S.Ct. 3535, 82 L.Ed.2d 840] (1984).

*Id.*

The light shed on the definition of an "act" under RICO by our recent decision in *United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc), reinforces our analysis of Kaplan's conduct set forth in *Friedman*. In *Indelicato*, we held that the nearly simultaneous shooting and killing of three persons to effect a change in leadership of an organized crime family constituted more than one predicate "act of racketeering activity," and was sufficient to establish the basis for a "pattern." 865 F.2d at 1381–85. The guidance provided by *In-*

*delicato* on what constitutes one "act" for RICO purposes is straightforward—"where in fact there are a number of different acts, each should be separately counted." *Id.* at 1383. Temporal proximity of "like acts for similar purposes against a number of victims," *id.*, does not require that two or more acts be counted as one. *Id.*

Using the generic definition of bribery, it is clear that two bribes took place. Kaplan intended to affect the individual actions of both Lindenauer and Manes in the performance of their distinct official duties. With respect to each bribe he sought a particular service: (i) Lindenauer was to ensure that the PVB selected Citisource for the hand-held computer contract; and (ii) Manes was to smooth the way for approval in the Board of Estimate. Given Kaplan's overt intent to influence the conduct of each official individually and the clear division of bribe compensation into separate, earmarked blocks of stock, we cannot quarrel with the jury's conclusion that, through the one conversation with Lindenauer, Kaplan engaged in two distinct acts of bribery which may be separately counted for purposes of proving a RICO pattern. In the instant case, therefore, the fact that the two bribes were offered by Kaplan simultaneously does not mean that they must be counted as one act, and this case does not involve an "attempt by the government ... to go beyond Congress's intent and fragment an act that plainly is unitary into multiple acts in order to invoke RICO." *Id.* at 1383.

## 2. *The Threat of Continuity Requirement*

The conclusion that Kaplan's conduct constituted two "acts" is only the first step of our inquiry, however. *See Indelicato,* 865 F.2d at 1382 (explicitly abandoning our earlier view, *compare United States v. Ianniello,* 808 F.2d 184 (2d Cir.1986), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987), that two acts, without more, may suffice to establish RICO pattern). We now address whether the acts occurred in a context supporting the inference of a RICO "pattern." Under *Indeli-*

*cato,* "a RICO pattern may not be established without some showing that the racketeering acts are interrelated and that there is continuity or a threat of continuity; ... racketeering acts that are not widely separated in time or space may nonetheless, given other evidence of the threat of continuity, constitute a RICO pattern." 865 F.2d at 1381. The interrelationship of Kaplan's two predicate bribes in order to obtain a common goal, *see id.* at 1382—the hand-held computer contract for Citisource—is self-evident.

██ We thus must focus on whether there was sufficient evidence of a threat of continuing racketeering activity. In *Indelicato,* we recognized "a tension between relatedness and continuity, [where the acts are temporally proximate] for obviously the shorter the elapsed time between the two acts, the less it can be said that the activity is continuing." *Id.* at 1383. The tension is to be resolved by reference to the overall context in which the acts took place: "where the virtual simultaneity of two acts suggests that they are related, the timing does not negate the existence of a pattern; rather, evidence of continuity or the threat of continuity will simply have to come from facts external to those two acts." *Id.*

One source of such "external facts" may be the nature of the RICO enterprise. We stated in *Indelicato* that "[w]here the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity." *Id.* at 1383–84. The same may be true of racketeering activities carried out in association with a legitimate enterprise if performed at the behest of an organized crime group. *Id.* In *Indelicato,* the nature of the Commission, the alleged ruling body of leading organized crime families throughout the United States, "made it clear beyond peradventure that there was a threat of continuing racketeering activity." *Id.* at 1384–85.

Other kinds of external facts may of course also provide evidence of the requisite threat of continuity when the nature of

the enterprise does not by itself suggest that racketeering acts will continue. *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir. 1989) (en banc), *vacated for further consideration*, —— U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), *upheld* by order of Sept. 15, 1989, offers some guidance. In *Beauford*, a civil RICO case, we held that allegations of a complaint that defendants had mailed fraudulent documents to thousands of persons in connection with the conversion of an apartment complex into condominiums, and that there was a basis to infer that similar mailings would be made in the future, were sufficient to plead a RICO pattern. The threat of continuity was thus supplied by factors other than the enterprise itself, which was a real estate partnership sponsoring the conversion and the individual defendants as a group. These allegations tended to belie any characterization of the defendants' activities as "isolated" or "sporadic." 865 F.2d at 1392.

 Similarly, in the instant case, factors other than the nature of the enterprise itself, namely Kaplan's demonstrated willingness to facilitate corruption generally in the PVB, amplified the full character of the predicate acts and their relationship to the enterprise and thus provided sufficient evidence that those predicate acts entailed a threat of continuity sufficient to support a finding of a RICO pattern. As detailed *supra*, Kaplan initiated Delario's corrupt relationship with Friedman and helped Delario conceal the arrangement by laundering Friedman's bribe-brokering fee with funds that his own company, Data Conversion, owed to Datacom. Kaplan also laundered a fee to Friedman for his participation in facilitating the BJV bribes. Finally, at the time the investigation of this case brought a halt to further activities, Kaplan was pursuing a scheme, involving, *inter alia*, a sizeable payoff to Lindenauer,

to obtain illegally a new PVB data-processing contract. Where external facts such as these demonstrate a defendant's continuing intent and ability to participate in various ways in the corruption of the enterprise, a trier of fact may find that the predicate acts entail a threat of continuing racketeering activity.

The evidence here was thus sufficient to avoid the danger of "the application of RICO to the perpetrators of 'isolated' or 'sporadic' criminal acts." *United States v. Indelicato*, 865 F.2d at 1383 (quoting *Sun Savings & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 192 (9th Cir.1987)). While evidence of the two Citisource bribes alone might have been legally insufficient to prove the requisite pattern, Kaplan's further related actions outlined above were sufficient to show that the Citisource bribes were not "sporadic" or "isolated" acts.

Although this case was tried before *Indelicato* and *Beauford*, the evidence of Kaplan's involvement in PVB corruption beyond the Citisource bribes was clearly before the jury regarding the pattern issue. The district court in fact denied Kaplan's request for a limiting instruction forbidding the jury to consider Kaplan's alleged involvement in the Datacom or BJV bribes in evaluating the proof of a pattern, and instead instructed it that it could consider that conduct for the purpose of determining whether Kaplan engaged in a RICO pattern.[1]

 We find no merit in Kaplan's contentions that there are procedural barriers to our taking into account as "external facts" Kaplan's activities other than the Citisource bribes. Relying on *United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988), Kaplan argues that the element of

---

1. The charge stated in pertinent part:
 .... [Y]ou would then go on to consider the next words of the statute and decide whether or not the particular defendant whose case you are considering had participated in the conduct of the affairs of the PVB through a "pattern of racketeering activity."
 Many have found that to be a confusing phrase, but it is easy to understand if properly

analyzed. The Congress had said that a pattern of racketeering activity exists where a person commits at least two criminal acts which have been categorized by the Congress as racketeering acts and commits those acts, not as separate and disconnected offenses, but as part of a larger pattern of activity connected with that person's participation in the conduct of the affairs of the enterprise.

continuity cannot be established by evidence of other uncharged alleged acts of racketeering activity. In *Davidoff*, we held that where a RICO conspiracy charge alleges the commission of extortionate schemes, including but not limited to those charged in the indictment, the government must identify in a bill of particulars the victims of uncharged extortionate schemes that it intends to prove at trial. The defendant, who had prepared to meet charges of extorting funds from one company, was denied a fair opportunity to defend against new allegations of extortions against unrelated companies. 845 F.2d at 1154. In contrast to *Davidoff*, Kaplan was provided by the indictment and a proffer of the government's evidence to defense counsel with notice that the government would offer evidence of the Datacom and the BJV bribes. Kaplan was thus not deprived of a fair opportunity to defend.

 The fact that many of Kaplan's activities furthering corruption in the PVB were not charged as predicate acts is also of no moment. Even if such external evidence involves criminal activity, a defendant who has notice that he or she may face such proof is not prejudiced by the failure to charge such activity as a predicate crime. Indeed, that failure enhances the possibility that the jury may find that the requisite two racketeering acts have not been proven.[2]

We similarly reject the argument that reliance on testimony concerning the Datacom and BJV bribes to establish continuity constituted an alteration of the charges of the indictment against Kaplan with respect to the pattern requirement after the grand jury had passed on them. Citing *United States v. Zingaro*, 858 F.2d 94 (2d Cir.1988), Kaplan contends this presents an impermissible risk of conviction on a basis other than the predicate acts alleged. Unlike *Zingaro*, however, there is no indication here that the jury relied on evidence of uncharged acts to find that the predicate acts had been proved. The jury

was thus specifically instructed to consider only the two charged bribe offers when deciding whether the government had proved two predicate acts, and later noted on a special verdict form the two acts that were the predicate of the finding of a pattern. Whether the Datacom witnesses' testimony relating to Kaplan having engaged in a "pattern" was before the grand jury is irrelevant, because his conviction at trial on the charge cures any evidentiary insufficiency at the grand jury stage. *United States v. Mechanik*, 475 U.S. 66, 73, 106 S.Ct. 938, 943, 89 L.Ed.2d 50 (1986).

Affirmed.

**2.** The consequences for double jeopardy purposes of the government relying upon un-

charged racketeering acts are not before us.