**UNITED STATES of America, Plaintiff,**

v.

**Salvatore T. BUSACCA, et al., Defendants.**

**Crim. A. No. CR 88–356.**

United States District Court, N.D. Ohio, E.D.

Feb. 23, 1990.

Michael T. Rae, Cleveland Strike Force, U.S. Dept. of Justice, Cleveland, Ohio, for plaintiff.

Mark R. DeVan, Mark A. Stanton, Elmer A. Giuliani, William D. Beyer, Joseph E. Rutigliano, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Pending are the motions of each defendant, made at the close of the government's case, for judgments of acquittal as to all counts, pursuant to Federal Rule of Criminal Procedure 29. For the reasons set forth below the motions are denied.

### I.

■ In ruling on a motion for acquittal pursuant to Rule 29, the Court "must view the evidence and all reasonable inferences in the light most favorable to the government." *Glasser v. United States,* 315 U.S.

60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Holloway,* 731 F.2d 378, 381 (6th Cir.1984), *cert. denied,* 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984). If the evidence is such that a reasonable mind might fairly find guilt beyond a reasonable doubt, the motion for judgment of acquittal should be denied. *Holloway,* 731 F.2d at 381.

The indictment in this case alleges six counts of embezzlement, each against various of the defendants, in violation of 18 U.S.C. §§ 2 & 664; one count charging all defendants with violating 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO); and one count charging all defendants with a violation of 18 U.S.C. § 1962(d), conspiring to violate RICO.

The facts testified to in the government's case may be summarized as follows. The Welfare Fund for Local 436 of the International Brotherhood of Teamsters is a separate and distinct entity from the Local's Pension Fund but the two have the same Board of Trustees. The defendants charged are all associated with the Welfare Fund. Salvatore "Sam" Busacca was the president of Local 436 and the Chairman of the Board of Trustees of the Local 436 Welfare and Pension Funds. Pat Lanese was the vice-president of Local 436 and the office manager of Local 436 Welfare and Pension Funds. Salvatore I. Busacca (Sam Busacca, Jr.), the son of Sam Busacca, was employed by Local 436 Welfare and Pension Funds. He was responsible for preparing checks drawn on the Welfare Fund account for signature. Gary Tiboni was a trustee of Local 436 Welfare and Pension Fund and the secretary-treasurer and a business agent of Local 436. Michael Paventi was a trustee for the Welfare and Pension Fund after March 1, 1987 and was employed as a business agent for Local 436.

The government offered testimony showing that all the defendants knew each other, worked together on union political matters, and were friends. In April of 1986, Sam Busacca and Deborah Hanson, his secretary as well as secretary to the Board of Trustees, were indicted in federal court on multiple counts of embezzlement of welfare and pension funds and on charges of racketeering. In May 1986, Sam Busacca sought advice from the Welfare Fund's counsel, Joseph Kalk, and from the Pension Fund's counsel, Stanley Gottsegen, concerning the legality of the Fund advancing money to pay for his and Hanson's criminal legal defense fees. Both attorneys reported, at a Board meeting attended by both Busacca and Tiboni, that neither could find any statute or case law holding that it was either permissible, or impermissible, to advance the fees. Lanese, as a matter of routine practice, was provided copies of the minutes of the Board's meetings.

In June 1986, all trustees received letters from the Department of Labor indicating that the department viewed the advancement of these fees as impermissible, and would institute civil litigation if such advancement were made. The trustees, through Sam Busacca and Joseph Kalk, arranged to go to Washington, D.C. to meet with Department of Labor officials to discuss the matter. The meeting was cancelled by Busacca on the advice of his attorney. At a June 1986 Board meeting, the Board voted that it would advance these fees if either the Department of Labor approved the advancement, or if a court issued a declaratory judgment that such payment was lawful. Tiboni and Busacca were present at this meeting and Lanese received a copy of the minutes.

Counsel had also advised the Board of Trustees to seek independent legal advice concerning the advancement of fees. On June 17, 1986, the Board authorized Busacca to seek such opinions. However, Busacca had, before receiving this authorization, already sought such an opinion from an attorney named George Faulkner. He also met with Gerald M. Feder, another attorney. Paventi accompanied him to that meeting.

Faulkner's opinion was that fees could be advanced only if specific conditions were met. Faulkner's opinion was presented to the Board of Trustees. Feder opined that fees could not be advanced except in very

narrow circumstances. Hanson testified that when Feder's 40 page written opinion was received, Busacca said it was "not the opinion [they] were looking for", and it was not made available to the members of the Board of Trustees. Each opinion addressed only the question of whether Hanson could be advanced fees and neither addressed the legality of advancing fees to Busacca. The bill for Faulkner's legal services was presented to the Board for approval but the bill for Feder's was not. The Feder bill was paid by a check drawn on the Fund, prepared by Sam Busacca, Jr. and signed by Lanese and Tiboni.

Busacca continued to seek legal opinions and traveled on several occasions to Chicago to meet with attorney Albert Grasso. Michael Paventi accompanied him on these trips. Albert Grasso was contacted as early as the summer of 1986 but did not give an opinion until March of 1987. At a March 1987 meeting of the Board of Trustees, Grasso appeared and opined that fees could be advanced to Deborah Hanson. Busacca, Tiboni and Paventi were all present. There was testimony that, before the meeting, Busacca told Hanson to get a bill from her attorney to present to the Board because Grasso was going to give the opinion that they "had been looking for". During the meeting, Hanson's legal bill was presented to the Board, a check was prepared by Sam Busacca, Jr., given to her, and she signed a repayment agreement.

After this, Gottsegen, the attorney for the pension fund, immediately resigned, telling the trustees that he believed the advancement of fees to Hanson was wrong. After Gottsegen's resignation, Kalk wrote to the Board and stated that if the advancement were to someone specifically charged with receiving union funds, he would have recommended that fees not be advanced. Busacca had been charged with illegally receiving money from the union and the welfare and pension funds.

On May 31, 1987, after the criminal trial against Busacca and Hanson had commenced, the Board of Trustees met and established a general policy that fees could be advanced to a trustee in a criminal matter (1) if the Board made an independent determination that there was no culpability on the part of the trustee; and (2) if the trustee executed a repayment agreement. Another trustee, Sam Reilly, who was appearing before a grand jury, and Sam Busacca, then left the room, and the remaining board members voted that there had been no showing of culpability on the part of Busacca or Reilly. The minutes of the meeting show no further discussion regarding specific authorization that payments actually be made on behalf of either Reilly or Busacca.

Following this meeting, Sam Busacca's legal fees were paid but no bill was ever presented to the Board of Trustees, and there is no evidence to show that the Board, as a body, was aware that the payments were being made. Specifically, the following checks were written to Sam Busacca:

1. On June 5, 1987, a check for $110,000 was prepared by Sam Busacca, Jr., signed by Gary Tiboni and Pat Lanese and drawn on the Local 436 Welfare Fund Checking Account payable to Sam Busacca.

2. On June 25, 1987, a check for $50,000 was prepared by Sam Busacca, Jr., signed by Pat Lanese and Gary Tiboni and drawn on the Local 436 Welfare Fund Checking Account payable to Sam Busacca.

3. On July 17, 1987, a check for $30,000 was prepared by Sam Busacca, Jr., signed by Pat Lanese and Romeo Turchi, another trustee, and drawn on the Local Welfare Fund Checking Account payable to Sam Busacca.

4. On June 31, 1987, a check for $25,000 was prepared by Sam Busacca, Jr., signed by Pat Lanese and Gary Tiboni and drawn on the Local Welfare Fund Checking Account payable to Sam Busacca.

5. On August 13, 1987, a check for $19,000 was prepared by Sam Busacca, Jr., signed by Pat Lanese and Michael Paventi and drawn on the Local Welfare Fund

Checking Account payable to Sam Busacca.

6. On August 19, 1987, a check for $25,435 was prepared by Sam Busacca, Jr., signed by Pat Lanese and Michael Paventi and drawn on the Local Welfare Fund Checking Account payable to Sam Busacca.

The above six checks correspond to the six counts of embezzlement in the indictment.

The government presented testimony that it was the policy or practice of the Funds to have legal as well as other professional fees presented to the Board of Trustees for approval prior to payment being made. The government also presented testimony that, ordinarily, checks in these amounts were not prepared and presented for signature until there had been specific authorization, and unless there was proper supporting documentation—the bill. Two trustees, Reilly and Turchi as well as Deborah Hanson testified that during the summer of 1987 they did not know that Busacca's legal fees were being paid by the Fund. Turchi signed one of the checks to Busacca but had no recollection of doing so and on the day when it was signed, he also signed many other checks for the Fund. Further, there is testimony that the agenda of the Board of Trustees was controlled by Sam Busacca. Thus, a jury could infer that the defendants conspired to keep these payments secret.

## II.

### A. Embezzlement

The defendants are charged, as related to the checks listed above, with embezzlement pursuant to Title 18 of the United States Code sections 664 and 2. Section 664 punishes:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith. . . .

The government must prove that there was a (1) conversion or theft of (2) funds of an employee welfare plan and (3) that the defendants acted willfully.

█ The government has presented sufficient evidence from which a reasonable juror could find that each defendant participated in the drafting and the signing of checks drawn on the fund to convert this money to Sam Busacca's use. The testimony could be viewed as showing that the checks were prepared by Sam Busacca, Jr. knowing that there was no proper Board authorization and that the supporting documents showed some discrepancies between the amounts paid and the amounts received by the attorney. The testimony could also be viewed as showing that the signatories signed the checks without having the proper authorization from the Board of Trustees to do so and that because of their familiarity with the practices of the Fund, they knew that such a check was not authorized and should not be signed. The government has also presented testimony from which a reasonable juror could find that Sam Busacca orchestrated the entire affair by first searching for a legal opinion which met his needs, controlling the agenda of the Board of Trustees, and having his son prepare checks, knowing that they had not been approved according to routine policy, for the payment of his legal fees. The testimony, if believed, would be sufficient for a jury to find that each of the defendants assisted in the embezzlement of these funds from the Fund.

### B. RICO

(1) All defendants also are charged with violating 18 U.S.C. § 1962(c) which provides:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

As a necessary element, the government must prove either "a pattern of racketeering activity" or "collection of an unlawful debt." In this case, defendants are charged with engaging in a pattern of racketeering activity. Defendants have moved for acquittal on the RICO counts because the government has failed to charge and prove that defendants engaged in a pattern of racketeering activity.

The pattern requirement of RICO has led to a "plethora of different views" in the courts of appeals. *H.J. Hunt v. Northwestern Bell,* — U.S. —, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989). The statute defines "pattern of racketeering activity" as follows:

> (5) [it] requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering.

18 U.S.C. § 1961(5). In *H.J. Hunt,* the Supreme Court attempted to define the pattern requirement. The Court rejected the Eighth Circuit's requirement that the underlying predicate acts be part of more than one scheme. The Court found that this limitation was too restrictive and that one scheme with two or more predicate acts could be sufficient to show a pattern of racketeering activity. 109 S.Ct. at 2809. Here, there are six embezzlements charged so there is a sufficient number of predicate acts. There is only one scheme—taking enough money to pay Sam Busacca's criminal legal fees, but that is sufficient.

The predicate acts, however, must also form a pattern. Under RICO two unrelated predicate acts are insufficient. "It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them 'ordered' or 'arranged.'" *Id.* at 2900. Not only must the acts be related, they must show the "threat of continuing activity." *Id.* "It is this factor of continuity plus relationship which combines to produce a pattern." *Id.* (citation omitted).

Defendants argue that there is no continuity and thus, no pattern as required un-der RICO. The Supreme Court defined continuity as follows:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. (citation omitted) It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such case, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* at 2902. The Court further stated:

> Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.

*Id.*

In *H.J. Hunt,* the Court found that dismissal of the RICO counts was not proper. The plaintiffs had alleged that over a six year period officers of Northwestern Bell had given members of the Minnesota Public Utility Commission bribes in order to receive favorable rate rulings. This conduct showed one scheme (to influence policy makers) and showed continuity in one of two ways: (1) six years was a substantial period of time or (2) the bribery may have

been Northwestern's way of conducting its business. *Id.* at 2906.

Defendants argue that because the predicate acts alleged by the government occurred over only a two and a half month period and were part of a closed ended scheme—the payment of Busacca's legal fees—there is no showing of a pattern of racketeering activity. A survey of the cases reported interpreting *H.J. Hunt* leads this Court to believe that, while the question is close, the government has alleged and presented sufficient evidence to show that there was a pattern of racketeering activity.

■ The government urges this Court to adopt the test for continuity used by the Second Circuit in *United States v. Kaplan,* 886 F.2d 536 (2nd Cir.1989). This Court is persuaded to do so. *Kaplan,* one of the few reported cases since *H.J. Hunt* involving criminal RICO charges, involved a scheme by Kaplan and companies controlled by him to obtain and keep lucrative contracts with the parking violations bureau through the use of bribery. Kaplan was charged with and convicted of violating 18 U.S.C. §§ 1962(c) & (d). Only two predicate acts were alleged. On appeal, the only issue was whether there was sufficient evidence of a pattern of racketeering activity. *Id.* at 540.

The conviction was upheld. The Second Circuit determined, based upon facts other than the predicate acts, that there had been a sufficient showing of a threat of continuity. The court "recognized 'a tension between relatedness and continuity, [where the acts are temporally proximate] for obviously the shorter the elapsed time between the two acts, the less it can be said that the activity is continuing.' [*United States v. Indelicato,* 865 F.2d 1370, 1383 (2nd Cir.) (en banc) *cert. denied,* —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989)]. The tension is to be resolved by reference to the overall context in which the acts took place 'where the virtual simultaneity of two acts suggests that they are related, the timing does not negate the existence of a pattern, rather, evidence of continuity will simply have to come from facts external to those

two acts.' [*Indelicato,* 865 F.2d at 1383]; *Kaplan,* 886 F.2d at 542.

■ In *Kaplan,* the court found that Kaplan's demonstrated willingness to use corruption within the parking violations bureau, when viewed with the predicate acts and the nature of the enterprise, was sufficient to show a threat of continuity. *Id.* at 543. The Second Circuit's approach allows consideration of *all* the circumstances to determine whether there is a threat of continuity. This approach is sound because it allows prosecutors to bring RICO charges without being required to wait for months, or even years, to establish continuity by many predicate acts. It allows prosecutors to stop ongoing criminal activity instead of waiting, while more harm is done, for some arbitrary period of time to elapse.

Here, defendants' willingness to disregard established procedures and issue checks, particularly in light of the control exercised by these defendants over the funds of the enterprise, demonstrates their ability to continue converting funds. Further, the policy adopted by the Board of Trustees on May 31, 1987 allowing legal fees to be paid indefinitely into the future (even including the appeal process) are sufficient, in the context of a Rule 29 motion, to demonstrate the required continuity.

This Court finds the approach taken by the Second Circuit to be compelling. Moreover, the denial of defendants' Rule 29 motion is not inconsistent with other reported decisions involving RICO's application in a civil context.

The Third and Fourth Circuits have issued inconsistent opinions with respect to what is sufficient for a finding of continuity. In *Swistock v. Jones,* 884 F.2d 755, 759 (3rd Cir.1989), the court found that predicate acts over a period of more than a year were sufficient to show continuity. In *Menasco v. Wasserman,* 886 F.2d 681 (4th Cir.1989), the Court found that where there was one scheme, two victims, and one perpetrator with acts over the course of one year, there was no continuity within the meaning of RICO. These two contradictory opinions provide this Court with little assistance.

The Seventh Circuit in *Sutherland v. O'Malley*, 882 F.2d 1196 (1989), found that a single scheme by an attorney to divert settlement proceeds from his client to himself carried out over a five month period of time was insufficient to show continuity. The court reasoned that O'Malley was an "isolated offender" who was engaged in a "one-shot" effort to inflict a single injury. *Id.* at 1205. The case at bar can be viewed as involving multiple injuries—each check, and as having multiple victims—each member of the Fund.

In *Service Engineering Co. v. Southwest Marine, Inc.*, 719 F.Supp. 1500 (N.D. Cal.1989) the court found that a scheme by defendants which went on over a period of several months did not have the requisite continuity. The defendants engaged in one scheme involving several mail and wire frauds to falsely certify themselves as a small business for purposes of obtaining navy contracts. The court found that the closed period of time was insufficient and that there was no threat of continuity because only one scheme was involved, with a definite end—the size determination. *Id.* at 1508.

Another court found that predicate acts committed over a period of four months was insufficient to show the requisite continuity. *West Mountain Sales, Inc. v. Logan Mfg. Co.*, 718 F.Supp. 1084, 1087 (N.D. N.Y.1989). There was no threat of continuity because the "RICO claim presents a scenario in which defendants fraudulently misrepresented the propriety of conducting business in the territory which was governed by the exclusive dealership agreement. However, after the nullification of that agreement, there could not be further, similar misrepresentations." *Id.* Here, there was no nullification of any agreement or of any policy regarding the fees. The jury could find, on the evidence presented to it, that as long as there were legal fees due for any trustee charged with a criminal offense against the Fund, embezzlements to pay those fees could continue.[1]

In *Peterson v. Philadelphia Stock Exchange*, 717 F.Supp. 332 (E.D.Pa.1989), the court found that where there were only two perpetrators, one victim, and unlawful activity over the course of a few months, there was no pattern of racketeering activity. *Id.* at 337. The court cited *H.J. Hunt*, but provided no discussion of the basis for its holding. Thus, it is unclear if the acts were unrelated or if there was no continuity.

However, another court found that a series of predicate acts over several months was sufficient. *Orchard Hills Cooperative Apartments, Inc. v. Germania Federal Savings and Loan Association*, 720 F.Supp. 127 (C.D.Ill.1989). The court emphasized that each act of fraud was distinct and occurred over a period of several months. In the case at bar, each act of embezzlement can be viewed as distinct, particularly since different individuals were involved and they occurred over a period of several months. In *Yellow Bus Lines v. Drivers, Chauffeurs, & Helpers Local Union 639*, 883 F.2d 132 (D.D.C.1989), the court, on remand from the Supreme Court in light of *H.J. Hunt*, continued to find that the allegations of the complaint were sufficient to state a pattern of racketeering. The allegations involved acts of violence committed over the course of several months during a strike. The court found it to be a close question but found that the acts, if proved, could establish a threat of long term racketeering activity.

The determination of whether the predicate acts show sufficient continuity is fact specific. Prior case law provides guidance, but no clear bright line test. The evidence here shows a series of embezzlements which are related. The embezzlements occurred over a fairly short period of time, but the nature of the predicate acts suggests that they could continue over a long period of time. The manner in which the embezzlements occurred was capable of repetition indefinitely, as long as there were either legal fees or other expenses

---

1. The evidence of Busacca's conviction is not before the jury and thus, while defendants argue that this conviction necessarily stopped the scheme and any threat of continuity, this Court cannot rely on that assertion, but must look to all the evidence that is before the jury.

which Busacca or any other criminal defendant trustee wanted paid. Thus, while it is a close question, the Court finds, that viewing the evidence in the light most favorable to the government, there is sufficient evidence of continuity for a RICO pattern.

(2) Finally, defendant Paventi seeks to have RICO declared unconstitutional as void for vagueness. Paventi argues that the term "pattern of racketeering," as defined by the statute and the Supreme Court, is vague.

The void for vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citation omitted). The doctrine focuses on both actual notice to citizens and on arbitrary enforcement. The more important component is the latter, that the "legislature establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358, 103 S.Ct. at 1858 (citing *Smith v. Goguen*, 415 U.S. 566, 574, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974)). Without minimal guidelines, police, prosecutors and juries are without standards and may pursue their own predilections. *Kolender*, 461 U.S. at 358, 103 S.Ct. at 1858.

■■ There is a strong presumption that federal statutes are valid and they are not declared vague merely because there is difficulty in determining whether certain marginal offenses fall within their language. *United States v. National Dairy Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963); *New York v. Ferber*, 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982). A defendant has the burden of establishing that the statute is vague as applied to conduct charged against him. *Ferber*, 458 U.S. at 767–68, 102 S.Ct. at 3359–61.

■ Paventi relies on the concurring opinion in *H.J. Hunt*, in which Justice Scalia wrote:

No constitutional challenge to this law has been raised in the present case, and so that issue is not before us. That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when that challenge is presented.

109 S.Ct. at 2908. The Supreme Court has not yet faced a direct challenge to the constitutionality of RICO's pattern requirement on vagueness grounds.[2] Justice Scalia did not, however, feel strongly enough about this position to dissent, but concurred in the definition of "pattern" provided by the majority.

Paventi seeks to have this Court apply the vagueness doctrine based upon his asserted first amendment right to associate with other trustees. Paventi provides no authority other than bare allegations that he has such a right and that the right is implicated by the RICO charge. Paventi may have a right to associate with trustees, some of whom are defendants. However, there is no right to associate for the purpose of carrying out a criminal scheme. These charges do not implicate his ability to associate with other trustees for the purpose of carrying out legitimate fund business, and thus there is no first amendment concern.

Further, Paventi has not met the onerous burden of establishing that the definition of "pattern" is vague as applied to him.

### III.

Defendants' motions for judgments of acquittal are denied for the reasons set forth above.

IT IS SO ORDERED.

---

**2.** A vagueness challenge was mounted in *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 109 S.Ct. 916, 924–25, 103 L.Ed.2d 34 (1989) to the predicate act portion of Indiana's RICO statute. That case involved predicate acts encompassing obscenity crimes. The challenge was to the definition of predicate acts involving obscenity, and thus differs from the challenge presented here, which is to the definition of "pattern".