960 F.2d 1099
 UNITED STATES of America, Appellee,
v.
Jack J. MINICONE, Jr., also known as Jake; Jack Zogby, also
known as Turk; Anthony J. Inserra; Benedetto
Carcone, also known as Benny; Russell
E. Carcone, Appellants.
 Nos. 91, 295-297 and 721-723, Dockets 91-1014, 91-1015,
91-1018, 91-1020, 91-1062, 91-1319, 91-1334.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 4, 1991.
Decided Jan. 23, 1992.
As Amended on Petition for Rehearing April 13, 1992.
 
 Emil M. Rossi, Syracuse, N.Y. (John A. Cirando, Patrick J. Haber, and Ivette Iza, on the brief), for appellant Jack J. Minicone, Jr.
 Edward Z. Menkin, Syracuse, N.Y., for appellant Jack Zogby.
 David Lenefsky, New York City, for appellant Anthony J. Inserra.
 Anthony J. LaFache, Utica, N.Y., for appellant Benedetto Carcone.
 Joseph E. Fahey, Syracuse, N.Y. (Wiles & Fahey, on the brief), for appellant Russell E. Carcone.
 Andrew G. Levchuk, Atty., U.S. Dept. of Justice, Washington, D.C. (Frederick J. Scullin, Jr., U.S. Atty., Kevin E. McCormack, and Edward R. Broton, Asst. U.S. Attys., Albany, N.Y., on the brief), for appellee.
 Before: TIMBERS, MINER and ALTIMARI, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 Appellants Jack J. Minicone, Jr., Jack Zogby, Russell E. Carcone, and Benedetto Carcone appeal from judgments entered December 28, 1990 and January 2, 1991 after a jury trial in the Northern District of New York, Howard G. Munson, District Judge, convicting them of conducting the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) (1988), and of conspiring to conduct and participate in the affairs of an enterprise in violation of 18 U.S.C. § 1962(d) (1988). Appellant Anthony J. Inserra appeals from the judgment entered January 2, 1991 convicting him of conspiring to conduct and participate in the affairs of an enterprise in violation of 18 U.S.C. § 1962(d). Zogby also appeals from the judgment entered January 2, 1991 convicting him of conspiring to receive and transport stolen property in violation of 18 U.S.C. § 371 (1988).
 
 
 2
 Appellants' chief contentions on appeal are that there was insufficient evidence to support their convictions; that the district court erred in instructing the jury; that the district court erred in not declaring a mistrial; and that the district court erred in sentencing them. The government cross-appeals, contending that the district court erred in applying the Sentencing Guidelines.
 
 
 3
 We affirm the convictions and the sentences of all appellants, except we vacate Minicone's sentence and remand his case to the district court for the limited purpose of resentencing him in accordance with the Sentencing Guidelines.
 
 I.
 
 4
 We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.
 
 
 5
 Following a jury trial, Minicone, Zogby, Benedetto Carcone and Russell Carcone were convicted of conducting the affairs of an enterprise through a pattern of racketeering activity (RICO), in violation § 1962(c). They and Inserra also were convicted of conspiring to conduct and participate in the affairs of an enterprise through a pattern of racketeering activity (RICO conspiracy), in violation of § 1962(d). Zogby was convicted of conspiring to receive and transport stolen property, in violation of § 371.
 
 
 6
 Appellants' convictions stemmed from their alleged involvement in a wide-ranging criminal enterprise that profited from extortion, loansharking, illegal gambling, and trafficking in stolen property during the period from approximately 1973 to 1989. The alleged enterprise was centered in Utica, New York. It was run by unindicted co-conspirators Anthony Falange and Angelo Conte; both Falange and Conte died before the indictment in this case was returned. Cooperating witnesses Dennis Pritchard and Michael Andrello also participated in the enterprise.
 
 
 7
 The following is a brief account of appellants' principal activities as disclosed by the evidence at trial.
 
 
 8
 (A)
 
 
 9
 In 1973, Minicone and Inserra asked Pritchard to "do a score" on two local bookmakers, Philip and Frank DeFazio, after Falange and Conte had been approached by two individuals who were owed money by the DeFazios. Pritchard and another man proceeded to rough up the DeFazios and stole $8,000 in cash from them, $800-900 of which they gave to Minicone and Inserra. Minicone and Inserra did not "do the score" themselves because they feared they would be recognized by the DeFazios.
 
 
 10
 (B)
 
 
 11
 In 1976, Minicone, Zogby, and Inserra decided to kill Al Marrone shortly after his release from prison because they feared that Marrone wanted to kill Falange, and possibly them as well. They feared also that Marrone wanted to take over their territory. Minicone, Zogby, and Inserra began planning Marrone's murder six months beforehand. They initially contemplated paying $10,000 to an inmate at the penitentiary where Marrone was incarcerated. They rejected that idea, however, and proceeded to interview several other potential "hitmen". Ultimately, they hired Edward Noel, who had spent time in prison with Zogby, to help them kill Marrone. Inserra, Minicone, Zogby and Pritchard met with Noel in the early fall 1976 in a restaurant in Utica to plan the murder. In late September, Inserra and the others showed Noel one of the weapons to be used on Marrone, a semi-automatic rifle with field scope. Two to three weeks before Marrone's murder, Minicone asked to borrow Pritchard's .38 caliber pistol because he believed his own handgun might not be powerful enough to protect him in the event Marrone decided to strike first.
 
 
 12
 On the night of October 2, 1976, while Minicone and Inserra kept their distance and monitored a police scanner, Noel, Zogby, and another man shot Marrone dead on the sidewalk in front of his girlfriend's home.
 
 
 13
 Minicone and Inserra were indicted for Marrone's murder. The indictments were dismissed because Noel was a fugitive at the time, and the state did not have the nonaccomplice corroboration required by New York law. The state accepted a plea from Zogby to a lesser charge of soliciting murder, since Pritchard was not available to testify at that time. Zogby later confessed to his participation in the murder while talking with District Attorney Investigator Robert Graziano in Utica. Zogby claimed, however, that he had not fired the shots that killed Marrone.
 
 
 14
 (C)
 
 
 15
 On October 23, 1983, Thomas Bretti was injured when a bomb on the steps of his home exploded as he approached. The bomb had been made by government witness Andrello. It was planted by Minicone who had been assigned a contract on Bretti's life by Anthony Falange. Bretti had stopped paying some Utica bookmakers and had gotten into heated arguments with Falange and Louis Brindisi, Falange's attorney.
 
 
 16
 (D)
 
 
 17
 Appellants engaged regularly in the extortion of local bookmakers. Inserra once stated to Pritchard that "[t]he way we collect money is we scare people, we put fear in them, we rough them up. We have to use violence, but as long as they are scared they will pay." The ubiquitous Carl Mazza helped insure that bookmakers did not fall too far behind in their payments. Local bookmakers were forced to make regular stops at Benny's Swap Shop at 512 Albany Street, Utica, a headquarters of appellants, in order to make their monthly "protection payment".
 
 
 18
 George "Butch" Sandouk, a longtime Utica bookmaker, regularly stopped by Benny's Swap Shop to make protection payments to the enterprise. On numerous occasions he was observed delivering the payments to Benedetto Carcone, Russell Carcone, and Minicone. On January 12, 1988, prior to Sandouk's arrival at the Swap Shop, Benedetto Carcone informed Minicone that Sandouk was "like clockwork." When Sandouk arrived, Minicone and Benedetto Carcone discussed requiring Sandouk to pay extra during the basketball season:
 
 
 19
 "Carcone: Hey, how are you, Butch?
 
 
 20
 Minicone: ... [D]id he tell you about the baskets?
 
 
 21
 Sandouk: What baskets?
 
 
 22
 Minicone: You have to pay for the baskets, the baskets.
 
 
 23
 Sandouk: Yeah.
 
 
 24
 Minicone: Alright.
 
 
 25
 * * * * * *
 
 
 26
 Sandouk: Yeah ... alright ... this is towards ...
 
 
 27
 Minicone: Yours is twenty-five because your [sic] small, right?
 
 
 28
 Sandouk: Yeah, I know.
 
 
 29
 Carcone: And you don't have to ride around saying anything to anybody that your [sic] paying this thing.
 
 
 30
 Minicone: No, he knows better, he had his first time ... he knows better.
 
 
 31
 Carcone: Yeah.
 
 
 32
 Sandouk: Okay.
 
 
 33
 * * * * * *
 
 
 34
 Carcone: If anybody asks you, you're doing the same as you were ... did before.
 
 
 35
 Sandouk: Nobody knows nothing, I don't say nothing."
 
 
 36
 George "Hoppy" Tamer operated a bookmaking operation out of Utica for many years. He also ran a card game that allowed him to take a cut of the pot. Around 1983, Tamer was approached by Anthony Falange, who told him to make payments of $50-per-week so he "wouldn't have any problems". He originally made the payments directly to Falange. In approximately 1986 or 1987, at the request of Falange, Tamer began making the payments to Benedetto Carcone. Tamer usually sent his brother-in-law, Hiklel Yaghy, to make the payments. Yaghy would deliver the payments to Carcone at the Swap Shop at 512 Albany Street. Tamer also made occasional payments to Minicone. On one occasion, Tamer paid Minicone while he was seated at a bar with Inserra and Pritchard. After Tamer walked away, Minicone said, "This is a joke. Its like taking candy from a baby with these people. Keep them scared, they keep paying. They even find us." Inserra agreed.
 
 
 37
 (E)
 
 
 38
 Pritchard and Inserra participated in a bookmaking operation during 1978-79. Inserra later was convicted and fined on charges related to that operation. Pritchard assisted Inserra in collecting and paying off bets. Minicone also took and collected bets.
 
 
 39
 (F)
 
 
 40
 Benedetto and Russell Carcone, along with two other individuals, conducted a football parlay sheet operation out of 512 Albany Street between November 1987 and April 1988. They were not successful in the endeavor. Benedetto Carcone once commented to Falange that "I'm the only f---ing bookmaker in town that's losing money in these f---ing things."
 
 
 41
 (G)
 
 
 42
 Zogby engaged in the fencing of stolen property, much of which was supplied to him by government witness Pritchard. Pritchard also sold stolen goods to Falange and Benedetto Carcone, who resold the goods from their respective Swap Shops. Pritchard and others would obtain merchandise on shoplifting or "boosting" trips throughout the Northeast. Zogby became anxious when he learned that Pritchard had begun cooperating with the government; he commented "They got me with interstate transportation...."
 
 
 43
 (H)
 
 
 44
 Appellants also were active in loansharking. In a conversation recorded in October 1986, Inserra commented to Pritchard that "Benny's in charge of the loansharking", and "[y]ou pay 10% a week or a month, or whatever the hell it is, interest." Pritchard and Andrello both borrowed money at usurious rates to finance their burglary and financing ventures. Once, when Andrello fell behind in his payments, Minicone and Inserra paid him a visit to tell him that "Ange [Conte] wants that money...." Andrello told them that he would pay Conte in person. He did so the next day.
 
 
 45
 In December 1987, Minicone brought Salvatore Spina to 512 Albany Street to discuss borrowing $2,500 for six months. Benedetto Carcone told him that the interest rate would be "2 points a week--10 points a month." Later that day, Carcone told Falange about the individual who wanted to borrow money, saying that Minicone had okayed it. When Spina later was arrested and could no longer make the payments, Minicone indicated to Carcone that he himself would have to make good on the loans since he had vouched to Falange for Spina.
 
 
 46
 (I)
 
 
 47
 When appellants learned of the government's investigation involving them and of the cooperation of Pritchard and Andrello, they discussed the matter amongst themselves with grave concern. Minicone commented to Benedetto Carcone, "You know how many people are going to jail? He was wired two f---ing years." They planned to kill Pritchard, but they were frustrated because security around Pritchard was too tight and they could not get close enough to kill him.
 
 
 48
 (J)
 
 
 49
 Following a jury trial, appellants were convicted of the offenses set forth in the first paragraph of this opinion.
 
 
 50
 Minicone was sentenced to a total of 391 months imprisonment and 3 years of supervised release. Inserra was sentenced to a total of 240 months imprisonment and 3 years of supervised release. Zogby was sentenced to a total of 78 months imprisonment and 3 years of supervised release. Benedetto Carcone was sentenced to a total of 30 months imprisonment and 2 years of supervised release. Russell Carcone was sentenced to a total of 18 months imprisonment and 2 years of supervised release. Each of the appellants appeal. The government cross appeals the sentences of Minicone, Zogby, Russell Carcone, and Benedetto Carcone.
 
 
 51
 For the reasons set forth below, we affirm the convictions and sentences of all appellants, except we vacate Minicone's sentence and remand his case to the district court for the limited purpose of resentencing him in accordance with the Sentencing Guidelines.
 
 II.
 
 52
 (A)
 
 
 53
 Inserra, Zogby, Benedetto Carcone and Russell Carcone contend that the evidence against them was insufficient as a matter of law to support their convictions. When reviewing such claims, we view the evidence in the light most favorable to the government, United States v. Stanley, 928 F.2d 575, 576 (2 Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991), drawing all reasonable inferences and resolving all issues of credibility in favor of the verdict. United States v. Macklin, 927 F.2d 1272, 1277 (2 Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 146, 116 L.Ed.2d 112 (1991).
 
 
 54
 Zogby and Russell Carcone contend that the evidence was insufficient to support their substantive RICO convictions. Zogby concedes that there was sufficient evidence to support the jury's finding that he committed the predicate acts which charged the Marrone murder and receiving and transporting stolen property, but he contends that these crimes were unrelated to any enterprise and did not constitute a pattern of racketeering.
 
 
 55
 Similarly, Russell Carcone contends that the two predicate acts for which he was charged--the extortion of George Sandouk and the conduct of the football parlay operation--did not amount to participation in the affairs of an enterprise through a pattern of racketeering. Benedetto Carcone makes the same argument with respect to the predicate acts for which he was charged--bookmaking, multiple acts of extortion of bookmakers--and two acts of illegal debt collection.
 
 
 56
 Proof of a RICO violation pursuant to § 1962(c) requires a showing that an "enterprise" engaged in a "pattern" of racketeering activity. An enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct", and it "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981).
 
 
 57
 "[T]he pattern requirement should be interpreted to prevent the application of RICO to the perpetrators of 'isolated' or 'sporadic' criminal acts". United States v. Indelicato, 865 F.2d 1370, 1383 (2 Cir.1989) (en banc). Two predicate acts will suffice to prove a pattern of racketeering, provided the prosecution also shows that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (emphasis in original).
 
 
 58
 The requirement of "relatedness" embodies two different concepts. The racketeering acts must be related to each other ("horizontal" relatedness), and they must be related to the enterprise ("vertical" relatedness). United States v. Long, 917 F.2d 691, 697 (2 Cir.1990). Evidence of relatedness and continuity or the threat of continuity may arise from facts external to the two predicate acts, United States v. Kaplan, 886 F.2d 536, 542 (2 Cir.1989), cert. denied, 493 U.S. 1076, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990); Indelicato, supra, 865 F.2d at 1383, including the nature of the RICO enterprise itself. Kaplan, supra, 886 F.2d at 542; Indelicato, supra, 865 F.2d at 1383. Two racketeering acts that "are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise." Indelicato, supra, 865 F.2d at 1383. Moreover, "[w]here the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity." Id. at 1383-84; United States v. Coiro, 922 F.2d 1008, 1017 (2 Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); Kaplan, supra, 886 F.2d at 542; see also H.J. Inc., supra, 492 U.S. at 242-43, 109 S.Ct. at 2902 ("[T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.").
 
 
 59
 The requisite vertical nexus between the RICO enterprise and the predicate racketeering acts may be established by evidence that the defendant was " 'enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise,' " or that " 'the predicate offenses are related to the activities of that enterprise.' " United States v. Robilotto, 828 F.2d 940, 947-48 (2 Cir.1987) (emphasis in original), cert. denied, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988) (quoting United States v. Scotto, 641 F.2d 47, 54 (2 Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981)).
 
 
 60
 Zogby contends that his involvement in the Marrone murder and his stolen property transactions were merely isolated dealings and that he was acting on his own personal behalf, not as a member of the enterprise. Although Marrone had threatened the lives of Inserra, Zogby and Minicone, the threats stemmed from Marrone's plan to take over what he believed was his--control of the operation in the Oneida County area. Moreover, Marrone's murder was perpetrated through the joint efforts of Zogby, Minicone and Inserra. The record supports the jury's finding that the murder of Marrone was accomplished as part of appellants' long-term association with the enterprise and was performed for the purpose of enriching the enterprise's members and consolidating its power. Indelicato, supra, 865 F.2d at 1383.
 
 
 61
 Likewise, there was sufficient evidence to support the jury's finding that Zogby's conduct of the stolen goods operation was related to conduct of the enterprise. Pritchard, a long-time associate of the enterprise, did the bulk of the shoplifting for Zogby. Pritchard also sold stolen property directly to Falange and Benedetto Carcone. Furthermore, Falange, Inserra and Minicone loaned money to Pritchard to help finance his "boosting" trips. There was sufficient evidence to support the jury's finding that Zogby's participation in the stolen goods operation, together with his participation in the murder of Marrone, constituted a pattern of racketeering activity in furtherance of the enterprise's affairs.
 
 
 62
 The evidence of Benedetto Carcone's participation in multiple acts of extortion of local bookmakers and collection of unlawful debts provided ample basis for the jury's finding that he had participated "directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Indeed, the extortion and debt collection activity engaged in by Benedetto Carcone, and by the enterprise in general, is at the heart of the conduct targeted by the RICO statute. H.J. Inc., supra, 492 U.S. at 245, 109 S.Ct. at 2903; Russello v. United States, 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983); Turkette, supra, 452 U.S. at 591, 101 S.Ct. at 7532. Such acts of extortion and illegal debt collection inherently exude a "pattern" and a threat of continuing criminal activity.
 
 
 63
 The evidence indicates that Russell Carcone's participation in the affairs of the enterprise may have been less extensive than that of the other appellants. Nevertheless, the two racketeering acts with which he was charged--participating in a gambling operation and in the extortion of Sandouk--support the jury's conclusion that he engaged in a pattern of racketeering in furtherance of the enterprise's affairs. Although Russell Carcone's acceptance of extortion payments from Sandouk, in violation of 18 U.S.C. § 1955, clearly was in furtherance of the enterprise's affairs, he contends that his RICO conviction should be reversed because the bookmaking operation was unrelated to the affairs of the enterprise. We hold that there was sufficient evidence for the jury reasonably to infer otherwise. Moreover, the evidence showed that Falange, the enterprise's boss, was aware of the bookmaking operation. In light of the enterprise's pervasive involvement in local bookmaking activities, the jury's finding that the bookmaking operation was sufficiently related to the affairs of the enterprise will not be disturbed.
 
 
 64
 Although the relationship between Sandouk's extortion and the bookmaking operation, standing by themselves, appears tenuous, evidence external to the acts themselves establishes the requisite "pattern". Here, the enterprise itself provides the requisite nexus between Russell Carcone's participation in bookmaking and extortion. Kaplan, supra, 886 F.2d at 542; Indelicato, supra, 865 F.2d at 1383; United States v. Masters, 924 F.2d 1362, 1366 (7 Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991). Appellants constituted an informal organization associated for the common purpose of engaging in an ongoing course of criminal conduct, Turkette, supra, 452 U.S. at 583, 101 S.Ct. at 2528, including extortion, loansharking, illegal gambling, and trafficking in stolen property. Russell Carcone's participation in the bookmaking operation and the extortion of Sandouk, on the specific facts of this case, demonstrate a pattern of racketeering activity.
 
 
 65
 Inserra contends that his involvement in the Marrone murder and in the gambling operation were isolated acts unrelated to the activities of the enterprise and therefore were insufficient to support the conspiracy charge against him. To prove a RICO conspiracy under § 1962(d), the government must show that the defendant agreed to participate in two predicate racketeering acts and he knew that the general nature of the conspiracy extended beyond his individual role. United States v. Rastelli, 870 F.2d 822, 828 (2 Cir.), cert. denied, 493 U.S. 982, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989). As stated above, the Marrone murder suffices as a predicate act sufficiently related to the enterprise's activities. We are invited to hold, however, that the sports book operation was not sufficiently related to the enterprise. We decline the invitation. The operation was run out of Inserra's house. Pritchard testified that he participated in the sports book operation and that Minicone took bets over the telephone and helped collect money from the gamblers. Pritchard also testified that the gambling operation actually was run by Inserra's brother, Mook, and that Anthony Inserra worked for Mook.
 
 
 66
 As the government points out, it is inconceivable that Pritchard, Minicone and Inserra could have been participating in the gambling operation without the enterprise also being involved. Indeed, as with Russell Carcone, Inserra's conviction is supported by the evidence regarding the enterprise's pervasive involvement in local gambling. The jury reasonably could have found that the gambling operation was related to the activities of the enterprise. Moreover, the jury reasonably could have found that the gambling operation and the murder of Marrone "form[ed] a pattern defined by the purposes of the enterprise." Masters, supra, 924 F.2d at 1366. The question of whether acts form a pattern "rarely is a problem with a criminal enterprise, as distinct from a lawful enterprise that commits occasional criminal acts." Id.
 
 
 67
 (B)
 
 
 68
 Inserra contends that he withdrew from the conspiracy more than five years before the indictment was handed down in August 1989 and that the RICO conspiracy charge therefore was time-barred pursuant to 18 U.S.C. § 3282 (1988). To escape liability, Inserra would have to prove some act that affirmatively established that he disavowed his criminal association with the conspiracy, United States v. Borelli, 336 F.2d 376, 388 (2 Cir.1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965); United States v. Nerlinger, 862 F.2d 967, 974 (2 Cir.1988), and that he communicated his withdrawal to the co-conspirators. Nerlinger, supra, 862 F.2d at 974. Here, Inserra bases his claim of withdrawal on his serious falling out with Minicone--to the point that Minicone shotgunned Inserra's home--in the early 1980's and that at that time Minicone had assumed a strong position within the enterprise. The dispute between Minicone and Inserra arose over the collection of money from some gamblers. Inserra had collected the money but kept Minicone's share because Minicone owed him money. Minicone was so incensed that he shot out the windows of Inserra's kitchen. At a sit-down with enterprise boss Falange, they were ordered to settle their differences. Although Inserra and Minicone apparently remained on less-than-friendly terms, there is evidence that Inserra maintained his connection with the conspiracy. In January 1988, Inserra asked Benedetto Carcone for 9 mm. bullets, although the ammunition was not supplied to him. In April 1988, Inserra stopped by the Swap Shop and told Carcone to get word to Falange that "there's something f---ing coming down."
 
 
 69
 We hold that there was sufficient evidence to support the jury's finding that Inserra had not withdrawn from the conspiracy.
 
 
 70
 (C)
 
 
 71
 Inserra and Zogby also contend that the district court failed properly to instruct the jury on the RICO counts. Specifically, they contend that the court failed to inform the jury that the predicate acts must be related to each other and to the enterprise. With respect to the requirement that the predicate acts be related to the enterprise and to each other, the court clearly instructed the jury that:
 
 
 72
 "The government must still convince you, beyond a reasonable doubt, that these predicate racketeering acts were united or related to each other in such a way that you can honestly say that you have been convinced beyond a reasonable doubt that there is a pattern of racketeering which links at least two of these acts as to each Defendant to the pattern which the government alleges.... [I]t is the quality and nature of those acts and how they are related to each other and to the alleged enterprise which, upon sober and reasonable reflection, you may say do or do not make out a consistent and unifying pattern of conduct through which the enterprise conducted its affairs."
 
 
 73
 Moreover, the court instructed the jury that:
 
 
 74
 "The acts of racketeering must also be part of a continuing course of conduct. The continuity required refers either to a closed period of repeated conduct or to past conduct that by its nature projects into the future with the threat of repetition."
 
 
 75
 We hold that the district court properly instructed the jury regarding the requirement that the predicate acts be related to each other and to the enterprise.
 
 
 76
 (D)
 
 
 77
 Minicone, Inserra, Russell Carcone and Zogby contend that a mistrial should have been declared because of the "grossly prejudicial incidents" they say were attributable to the prosecution. "[R]eversing a criminal conviction for prosecutorial misconduct is a drastic remedy that courts generally are reluctant to implement." United States v. Valentine, 820 F.2d 565, 570 (2 Cir.1987). There can be no reversal unless appellants can demonstrate "substantial prejudice" which deprived them of their right to a fair trial. Id.
 
 
 78
 Zogby claims that the jury was tainted during jury selection by the comment of one prospective juror to the effect that another prospective juror, after being excused, had indicated to another prospective juror that the case was about "the mob". The latter and those within earshot subsequently were excused. Another prospective juror commented that the indictment read like a novel, and a third prospective juror, who subsequently was excused, made a joking remark about organized crime. Although one of the prospective jurors who heard these comments was not excused, the court carefully instructed the jurors that the case did not involve the mafia and warned them not to discuss the case.
 
 
 79
 Inserra and Minicone also complain of three occasions during the trial when witnesses alluded to criminal conduct not charged in the indictment. The court struck such testimony and instructed the jury to disregard it. Furthermore, after hearing argument on the issue, the court determined that the incidents were attributable to the government's witnesses, not to the prosecutor.
 
 
 80
 Appellants also claim they were prejudiced by a witness who was in such poor condition (due to a car accident unrelated to the case) that he had to be brought on a stretcher into the courtroom to testify. The judge had not yet entered the courtroom. The jury reentered the courtroom before the judge. The witness subsequently was removed from court and his testimony was taken by deposition. The court instructed the jury that the witness's injuries were the result of a car accident and were unrelated to this case.
 
 
 81
 We hold that appellants have failed to demonstrate substantial prejudice which denied them their right to a fair trial.
 
 
 82
 (E)
 
 
 83
 Minicone contends that a taped conversation between Pritchard and Inserra was not admissible against him as a statement of a co-conspirator made in furtherance of the conspiracy, e.g. Rastelli, supra, 870 F.2d at 837, because Pritchard, at the time of the conversation, was an agent of the government. United States v. Birnbaum, 337 F.2d 490, 494-95 (2 Cir.1964). He contends that, since the tape was not redacted to exclude reference to him, he should have been granted a separate trial. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
 
 
 84
 Minicone's contention is without merit, since it is immaterial that Pritchard was working for the government at the time the conversation was recorded. "So long as the declarant and the party against whom the statement is offered in court were members of a conspiracy at the time the statement was made, any witness who heard the statement may recount it at trial, whether the statement was made to a conspiracy member or not...." 4 Weinstein & Berger, Weinstein's Evidence, p 801(d)(2)(E), pp. 801-305 (1991); United States v. Long, supra, 917 F.2d at 701; United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2 Cir.), cert. denied, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). The district court's finding that the statement was intended to promote the goals of the conspiracy is reviewed according to the clearly erroneous standard. Long, supra, 917 F.2d at 701; Beech-Nut, supra, 871 F.2d at 1198-99. Certainly, this finding was not clearly erroneous.
 
 
 85
 Moreover, to overturn a conviction based on the denial of a severance motion, a defendant must show that he was so severely prejudiced that, in effect, he was denied a fair trial--not only that his chances would have been improved at a separate trial. United States v. Scarpa, 913 F.2d 993, 1015 (2 Cir.1990). We hold that Minicone's contention that the district court committed reversible error in refusing to grant his motion for a severance lacks merit.
 
 III.
 
 86
 (A)
 
 
 87
 Inserra and Minicone contend that the district court erred in sentencing them under the Sentencing Guidelines. We hold that Minicone's claims, including, among others, that he was a minor or minimal participant in the crimes charged, are without merit. Inserra claims that the Guidelines should not have been applied to him because he withdrew from the conspiracy prior to November 1, 1987, when the Guidelines took effect. Since we already have held that Inserra failed to establish that he affirmatively withdrew from the conspiracy, his claim that the Guidelines should not have been applied to him also is without merit.
 
 
 88
 (B)
 
 
 89
 Inserra contends that the court improperly used the first degree murder guideline to establish his base offense level. Although New York law would have categorized the murder of Marrone only as second degree murder, the task of the district court was to find the offense level corresponding to the most analogous federal offense. U.S.S.G. § 2E1.1. According to the New York Penal Law § 125.25, a person is guilty of murder in the second degree when, with intent to cause the death of another, he causes the death of such person or third person. 18 U.S.C. § 1111 (1988) defines first degree murder as "willful, deliberate, malicious, and premeditated killing".
 
 
 90
 We hold that the district court did not err in concluding that the most analogous federal offense was first degree murder under § 1111.
 
 
 91
 Inserra also contends that application of the Guidelines to him violates the Ex Post Facto Clause of the Constitution, U.S. Const. art. I, § 9. Prior to November 1, 1987, a person convicted of a RICO conspiracy faced an indeterminate sentence of not more than 20 years. 18 U.S.C. § 1963 (superseded). Under the Guidelines, the sentence instead is based on the highest offense level applicable to the underlying racketeering activity, if that offense level exceeds 19. U.S.S.G. § 2E1.1. The highest offense level here was 43, based on the 1976 murder, and calls for the 20 year sentence the district court imposed.
 
 
 92
 We have found that in general no Ex Post Facto violation occurs by application of the Guidelines to "straddle crimes," that is, crimes beginning before the date of the Guidelines, but continuing thereafter. United States v. McCall, 915 F.2d 811, 816 (2 Cir.1990); United States v. Story, 891 F.2d 988, 991-92 (2 Cir.1989). In this case, Inserra was sentenced for a RICO conspiracy active between 1973 and 1989. While Inserra himself committed no predicate acts after the date of the Guidelines, he did not withdraw from the conspiracy and therefore remains fully liable for the acts of co-conspirators. United States v. Bafia, 949 F.2d 1465, 1477 (7 Cir.1991).
 
 
 93
 We recognize, as unique to Inserra's case, that no act of any conspirator committed during the Guidelines period, even if charged to Inserra, could result in the 20 year sentence imposed, and that the length of Inserra's sentence is determined solely on the basis of pre-Guidelines conduct. We note, however, that recidivist statutes, which operate similarly in this respect, do not violate the Ex Post Facto Clause even if enacted after commission of the past crimes forming the basis for the recidivist penalties. Gryger v. Burke, 334 U.S. 728, 732 (1948) (citations omitted) ("The [recidivist sentence] is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes. It is a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.").
 
 
 94
 The RICO conspirators in this case continued to act after the effective date of the law here being challenged, with full notice of the consequences. As in the case of a recidivist statute, fair warning of the penalty existed notwithstanding that the penalty itself is mechanically a function of a crime committed prior to passage of the sentencing law. Since Inserra did not withdraw from the conspiracy, he therefore may be charged with the notice that his co-conspirators had when they acted. The fair notice and reliance purposes of the Ex Post Facto Clause, Miller v. Florida, 482 U.S. 423, 429-30 (1987), are not violated by application of the Guideline to Inserra.
 
 
 95
 (C)
 
 
 96
 The government asks us to hold that the district court erred, as a matter of law, in using Zogby's solicitation of murder conviction only in calculating his criminal history and not in calculating his base level offense. The court applied Guideline § 2E1.1, Note 4, which provides that:
 
 
 97
 "[C]ertain conduct may be charged in the count of conviction as part of a 'pattern of racketeering activity' even though the defendant has previously been sentenced for that conduct. Where such previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense, treat as a prior sentence under § 4A1.2(a)(1) and not as part of the instant offense.... If this treatment produces an anomalous result in a particular case, a guideline departure may be warranted."
 
 
 98
 The government contends that since Note 4 applies only when a defendant previously has been sentenced for certain "conduct", and Zogby previously was sentenced only for soliciting a murder, Note 4 should not have barred using the conduct charged and proved in this case--the actual murder and activities leading up to that murder--in calculating his base offense level.
 
 
 99
 This presents what appears to be an issue of first impression in our Court. Although the government's contention strikes us as having some merit, we hold that the district court reasonably construed Note 4 to mean that the conduct underlying the previously imposed sentence should not be used in calculating the base level for the instant offense.
 
 
 100
 (D)
 
 
 101
 The government also contends that the district court erred in sentencing Minicone by departing downward to a total of 32 years 7 months rather than imposing the statutory maximum of 40 years. The court was motivated by a desire to avoid the unfairness that would result from the "grave disparity" between his sentence and that of the co-defendants. The court felt that "to blindly impose two 20-year consecutive sentences for this Defendant would, in the court's opinion, directly contradict one of the main goals in guideline sentencing, that is, to eliminate sentencing disparity." Disparity between the sentences of individual co-defendants, however, is not a proper basis for the downward departure made by the district court here. United States v. Restrepo, 936 F.2d 661, 671 (2 Cir.1991) (quoting United States v. Joyner, 924 F.2d 454, 460-61 (2 Cir.1991)) ("To reduce the sentence by a departure because the judge believes that the applicable range punishes the defendant too severely compared to a co-defendant creates a new and entirely unwarranted disparity between the defendant's sentence and that of all similarly situated defendants throughout the country.").
 
 
 102
 We hold that the district court abused its discretion in granting Minicone a downward departure to avoid a disparity between his sentence and that of his co-defendants. We therefore vacate Minicone's sentence and remand his case for the limited purpose of resentencing him in accordance with the Sentencing Guidelines.
 
 IV.
 To summarize:
 
 103
 We hold that the evidence was sufficient to support appellants' convictions under the RICO statute, 18 U.S.C. § 1962(c) and (d). We also hold that the district court properly instructed the jury on the necessary elements of the crimes charged. We further hold that the district court did not err in refusing to declare a mistrial. With the exception of Minicone's sentence, we hold that the district court did not err in sentencing appellants and all convictions are affirmed. With respect to Minicone, we vacate his sentence and remand his case to the district court for the limited purpose of resentencing him in accordance with the Sentencing Guidelines. We find no merit in the remainder of appellants' claims on appeal.
 
 
 104
 Affirmed in part; vacated and remanded in part.
 
 ON PETITION FOR REHEARING
 
 105
 Submitted Feb. 18, 1992.
 
 
 106
 Decided April 13, 1992.
 
 PER CURIAM:
 
 107
 The petition for rehearing of appellant Inserra is granted to the extent of amending our opinion by adding the following immediately after Part III(B) on pages 1110-1111:
 
 
 108
 In all other respects the petition for rehearing is denied.