14-2197-cr
*United States v. Vernace*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2015

(Argued: September 18, 2015      Decided: February 2, 2016)

Docket No. 14-2197-cr

UNITED STATES OF AMERICA,

*Appellee,*

v.

BARTOLOMEO VERNACE, AKA Pepe, AKA Bobby, AKA Bobby Glasses,
AKA Robert,

*Defendant-Appellant,*

ROBERT WEHNERT, AKA Bobby Werner, ANTHONY VAGLICA, AKA Bosch,
MICHAEL DOLPHIN, VITO CORTESIANO, AKA Vito Love,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

Before:

SACK, CHIN, and DRONEY, *Circuit Judges.*

Appeal from a judgment of the United States District Court for the Eastern District of New York (Townes, *J.*), convicting defendant of conspiring to engage in a racketeering enterprise in violation of the Racketeering Influenced and Corrupt Organizations Act, using, carrying, and possessing a firearm in relation to a crime of violence, and operating an illegal gambling business. On appeal, defendant contends that (1) the evidence at trial was insufficient to support his conviction on certain predicate racketeering acts, (2) the district court applied the wrong version of the firearm statute, and (3) a new trial is required based on newly discovered evidence about a cooperating witness.

AFFIRMED.

---

M. KRISTIN MACE, Assistant United States Attorney (David C. James, Amy Busa, Evan M. Norris, Amir H. Toossi, Assistant United States Attorneys, *on the brief*), *for* Robert L. Capers, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee*.

SETH GINSBERG, Law Office of Seth Ginsberg, New York, New York, *for Defendant-Appellant*.

---

CHIN, *Circuit Judge*:

In 1981, the two owners of the Shamrock Bar in Queens, New York, were shot to death in their establishment, following an altercation that began with a spilled drink. The murders became known as the Shamrock Murders.

More than thirty years later, defendant-appellant Bartolomeo Vernace was convicted, following a jury trial, of participating in the Shamrock Murders. On May 30, 2014, the district court entered judgment convicting him of (1) conspiring to engage in a racketeering enterprise in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d), (2) using, carrying, and possessing a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c), and (3) operating an illegal gambling business in violation of 18 U.S.C. § 1955.

Specifically, on the RICO count, the jury found that Vernace committed nine predicate racketeering acts in support of the conviction, including the Shamrock Murders and heroin distribution and related conspiracies. The district court sentenced him principally to life imprisonment for the RICO conspiracy, ten years' imprisonment for the § 924(c) violation to be

served consecutively, and five years' imprisonment on the illegal gambling count to be served concurrently.

Vernace appeals, arguing that (1) the evidence was insufficient for the jury to find that the Shamrock Murders and heroin offenses were related to the RICO conspiracy, (2) he was convicted under the wrong version of § 924(c), and (3) newly discovered evidence requires that we grant him a new trial. For the reasons set forth below, we affirm.

## BACKGROUND

### I. *The Facts*

At trial, the Government elicited testimony from 35 witnesses, including cooperators from the Gambino crime family and another "La Cosa Nostra" crime family, who testified about Vernace's role in the Gambino crime family. We recount below that evidence in the light most favorable to the Government. *See United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012).

#### A. *Vernace's Involvement in the Gambino Crime Family*

When Vernace was arrested on January 17, 2011, he was, by all accounts, a member of the Gambino crime family's three-person ruling panel, in charge of the operations of the organization. The Gambino crime family is an

organized operation that generates money for its members through criminal activities, including drug trafficking, robbery, extortion, illegal gambling, and loansharking. It is one of the five organized crime families in New York City that make up "La Cosa Nostra." Gambino members start as "associates" before they are inducted as "soldiers," who run their own crews of associates, and then move up to become "captains."

**B.** *The Shamrock Murders*

John D'Agnese and Richard Godkin, the owners of the Shamrock Bar in Queens, New York, died on April 11, 1981 -- D'Agnese from a single bullet to the sternum and Godkin from a single bullet to the head.

The evening before, on April 10, 1981, someone spilled a drink on the dress of Frank Riccardi's girlfriend at the Shamrock Bar. At the time, Riccardi was a Gambino associate in Anthony Ruggiano's crew. Riccardi got visibly upset; this attracted the attention of the bar owners. When D'Agnese introduced himself as owning the Shamrock Bar and attempted to calm Riccardi down, Riccardi retorted, "No, you don't. I run this place." App. at 220. He grabbed a bottle of vodka and set it down next to him. "See? This is my place. I do what I

want in here." *Id.* at 221. Godkin then intervened, and after a conversation, Riccardi appeared to have calmed down. Riccardi then left.

Riccardi, however, went next to Joseph Corozzo's social club, a Gambino gambling operation that members frequented. The social club was unmarked: Only a "members only" sign adorned its door. There, Riccardi found Vernace and Ronald Barlin. Vernace had been a Gambino associate since the early 1970s; though he and Barlin were once part of the same crew as Riccardi, they were now part of the same crew as Corozzo. Riccardi, Vernace, and Barlin together departed for the Shamrock Bar.

They entered through the front door. Barlin drew his gun. The crowd scattered. Riccardi went for D'Agnese. Vernace went for Godkin. Vernace had Godkin pinned to the shuffleboard machine. "Where's your gun now, tough guy? Go for your gun. Go ahead. Go for it," Vernace taunted, holding his own gun. App. at 224. Two gunshots were fired. D'Agnese collapsed; Godkin stumbled. Riccardi and Vernace bolted for the front door; Barlin ran, too, but not before he fired a round into the ceiling, capping their escape. D'Agnese and Godkin had been shot -- they died the next day.

## C. *Heroin Distribution*

Earlier, in January 1981, Special Agent Louis Diaz of the Drug Enforcement Agency was investigating undercover a heroin trafficking ring. He met Bruce Erbacher and Herbert Frank, two heroin dealers. Diaz told Erbacher and Frank that he was looking for a new source of supply for his clients in Philadelphia. Erbacher revealed that his suppliers were "well organized," meaning "organized crime, Italian Mafia, La Cosa Nostra." App. at 316. Diaz later asked Frank if this meant "connected[,] [f]amily." *Id.* at 318. Frank responded, "you got it." *Id.* at 319. After several heroin transactions, Erbacher mentioned during a conversation that his suppliers were "Ron and Pepe." *Id.* at 321. Though Vernace sported many nicknames throughout the years, at least one of them around that time was "Pepe."

At the time, Erbacher and Frank also dealt drugs with George Gleckler and his girlfriend. In conversations during these dealings, Gleckler's girlfriend testified that she heard, from time to time, the names "Pepe and Ron." *Id.* at 379. Then, at a dinner party one night at Frank's apartment, she saw Vernace and an associate come by and speak with Gleckler and Frank for fifteen

or twenty minutes in a bedroom. Then, Gleckler spoke with Frank. Afterward, Gleckler told his girlfriend that they now wanted him to sell heroin, too.

On May 13, 1981, Agent Diaz, after obtaining a warrant, proceeded to Frank's apartment to make an arrest. There he found and arrested not only Frank, but also Barlin and Anthony Cuccio, another Gambino member. From the premises, he seized heroin, a scale, a sawed-off shotgun, and $50,000 in cash. As he was making these arrests and seizures, the phone rang. The man on the phone identified himself as Pepe and asked to speak with Cuccio. Pepe asked Cuccio, "Is everything okay?" *Id.* at 327. When Cuccio answered, "no," they both hung up. *Id.*

## D. *Vernace's Rise and Arrest*

Vernace went into hiding following the Shamrock Murders and after Barlin and the others had been arrested and indicted. He did not reappear until the mid-1980s. Starting then, Gambino members would see him periodically at Gambino social clubs or Christmas parties. By the late 1990s, Vernace was formally inducted as a soldier. In 2008, when the members of the Gambino crime family's ruling panel were arrested, Vernace and two others took over.

On January 20, 2011, the Government arrested Vernace at a café that he owned in Queens, New York, which also housed video gambling machines. Several thousand dollars in cash were seized.

## II.    *Proceedings Below*

The Government charged Vernace with three counts: RICO conspiracy, a § 924(c) violation, and illegal gambling. On April 17, 2013, following a month-long trial, the jury returned a guilty verdict on all counts. On May 15, 2013, Vernace moved for a judgment of acquittal.

On February 14, 2014, while the motion was still pending, the Government informed Vernace that it had learned in November 2013 that one of the cooperating witnesses had been violating his cooperation agreement since approximately 2010. The witness disclosed that he had been engaging in illegal gambling and collecting illegal gambling debts on behalf of others. On May 8, 2014, Vernace moved for a new trial pursuant to Federal Rule of Criminal Procedure 33 on the basis of this evidence that the witness had been violating his cooperation agreement.

On May 27, 2014, the district court denied both motions and sentenced Vernace principally to life imprisonment for the RICO conspiracy, ten

years' imprisonment for the § 924(c) violation to be served consecutively, and five years' imprisonment on the illegal gambling count to be served concurrently.

This appeal followed.

### *DISCUSSION*

Vernace contends on appeal that (1) the evidence was insufficient as to certain predicate racketeering acts, (2) the wrong version of § 924(c) was applied, and (3) newly discovered evidence requires that he be granted a new trial. We address each argument in turn.

### I. *Sufficiency of the Evidence*

We review *de novo* challenges to the sufficiency of evidence, but must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In conducting this review, we "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Coplan*, 703 F.3d at 62 (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)).

Where the Government asks the jury to find an element of the crime through inference, "[t]he jury may not be permitted to conjecture . . . or to conclude upon pure speculation or from passion, prejudice or sympathy." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972) (quoting *Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir. 1947)); *see, e.g.*, *United States v. Stewart*, 485 F.3d 666, 671 (2d Cir. 2007) ("Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence."). Instead, "[w]e must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

Vernace argues that the evidence at trial was insufficient for the jury to find that (a) the Shamrock Murders were "related" to the racketeering enterprise or (b) he engaged in a heroin conspiracy or that any such conspiracy was "related" to the enterprise. We disagree.

**A.      *Relatedness Under RICO***

RICO makes it unlawful for an individual to conduct or conspire to conduct an enterprise by engaging in "a pattern of racketeering activity." 18

U.S.C. § 1962(c); *see id.* § 1962(d).  A pattern of racketeering activity involves, at minimum, two predicate racketeering activities -- including, for example, murder, drug trafficking, and illegal gambling -- that occur within ten years of one another.  *Id.* § 1961(1), (5).

But RICO does not apply to "the perpetrators of 'isolated' or 'sporadic' criminal acts."  *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (*en banc*) (quoting *Sun Savings & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 192 (9th Cir. 1987)).  Criminal conduct only "forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are *interrelated* by distinguishing characteristics and are not isolated events."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989) (emphasis added) (quoting 18 U.S.C. § 3575(e) (1982)).  That is, predicate acts "must be related to each other ('horizontal' relatedness), and they must be related to the enterprise ('vertical' relatedness)."  *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992).

Vertical relatedness requires "that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense

related to the activities of the enterprise." *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010). "[I]t is not necessary," however, "that the offense be in furtherance of the enterprise's activities for the offense to be related to the activities of the enterprise." *United States v. Bruno*, 383 F.3d 65, 84 (2d Cir. 2004). Further, "the same or similar proof [that] establish[es] vertical relatedness" may also establish horizontal relatedness, because "the requirements of horizontal relatedness can be established by linking each predicate act to the enterprise." *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) (*per curiam*); *see also Indelicato*, 865 F.2d at 1382 (considering evidence of "temporal proximity, or common goals, or similarity of methods, or repetitions").

**B.**     *The Shamrock Murders*

Vernace argues that the Shamrock Murders were not related to the activities of the Gambino crime family. Those murders, he contends, resulted instead from a mere "personal dispute over a spilled drink." Appellant's Br. at 46.

To begin, Vernace's theory carries with it an air of implausibility. A jury need not credit a theory that is not supported "by reason and common sense." *Grey v. Heckler*, 721 F.2d 41, 50 (2d Cir. 1983) (Van Graafeiland, *J.*,

dissenting). Vernace argues that a mere spilled drink somehow cascaded into two brutal, and very public, murders. But the jury, seeking to make sense of the Shamrock Murders, could have reasonably rejected this theory and found instead that the Shamrock Murders were related to the activities of the Gambino crime family.

From the evidence, the jury could have reasonably inferred that Riccardi enlisted Vernace and Barlin to kill the two bar owners for disrespecting him as a Gambino associate and to uphold the reputation of the Gambino crime family. Riccardi was upset over the spilled drink, but may also have wanted to demonstrate to D'Agnese and Godkin that the Gambino crime family "r[an] th[e] place." App. at 220. During his interactions at the Shamrock Bar, Riccardi suffered an affront (real or perceived) to himself and to his authority as a Gambino associate, and, by extension, to the family. Vernace, in turn, helped him address the affront. That is, a reasonable jury could have concluded Vernace went so far as to commit murder in a crowded bar because such a public display related to preserving (and even enhancing) the reputation of the Gambino crime family and its members.

But the Shamrock Murders link back to the Gambino crime family in another way. The jury could also have reasonably concluded that Vernace participated in the Shamrock Murders to further his *own* reputation, thereby enabling him to more effectively carry out the activities of the Gambino crime family. The jury heard testimony that one of the goals of the Gambino crime family was "[t]o make money" through illicit means. *Id.* at 114. By building their own reputations, Gambino members gained "respect in the street" that they could directly leverage in the family's loansharking and extortion activities. Gov't App. at 65-66 ("[If] people are afraid of you, it's easier for you to make money for the Gambino family."). For example, the Government presented a secretly recorded conversation where one of Vernace's associates used the Shamrock Murders to collect loansharking debts by telling the victim that Vernace was "the real thing" and after warning that those sorts of homicides "happen[] every day." *Id.* at 12. The jury could have reasonably concluded that Vernace found it valuable to participate in the Shamrock Murders because doing so would later help him carry out other activities that benefitted the Gambino crime family.

Our case law supports the proposition that Vernace's conduct therefore lies within the heartland of what RICO targets. We have noted that "[t]he question of whether acts form a pattern 'rarely is a problem with a criminal enterprise, as distinct from a lawful enterprise that commits occasional criminal acts.'" *Minicone*, 960 F.2d at 1108 (quoting *United States v. Masters*, 924 F.2d 1362, 1366 (7th Cir. 1991)); *see Daidone*, 471 F.3d at 376 ("[S]prawling, complex enterprises, like the Luchese crime organization, are the prototypical targets of RICO."). This is because the predicate acts will share common goals (such as increasing or protecting the "position of the enterprise" or its members) and common victims (such as "those who threaten its goals") and will draw from "the same pool of associates . . . of the enterprise." *Daidone*, 471 F.3d at 376; *see also Burden*, 600 F.3d at 218-19 (finding relatedness where "violence enhanced the level of respect" for the racketeering enterprise and "garner[ed] [members] respect"). In this vein, it would have been reasonable for the jury to conclude that the Shamrock Murders related to the Gambino crime family because Vernace set out to promote the Gambino crime family's reputation (and in turn, his own) when he participated in the murders of D'Agnese and Godkin .

Nonetheless, Vernace contends that his case is indistinguishable from *United States v. Bruno*, where we concluded that the evidence was insufficient to prove that two shootings (which we characterized as "simply personal matters") were related to New York City's Genovese crime family. 383 F.3d at 85. In *Bruno*, the defendant, a Genovese associate, recruited two of his cousins (one of whom recruited another friend) to murder two other Genovese associates. We noted that "none of the shooters was a made member of the Genovese Family[,] nor were the Shootings themselves sanctioned by the family," and that it was "entirely reasonable" to conclude that the shootings were personal matters related to the defendant owing the victims tens of thousands of dollars in loansharking debts, the victims' suspected role in previously setting the defendant up to be robbed at a poker game, and the defendant's personal animosity toward the victims. *Id.* at 74 & n.1, 85. We therefore concluded in *Bruno* that the defendant committed the shootings for personal reasons unrelated to the Genovese crime family. *Id.* at 85. Vernace asserts that, like the shootings in *Bruno*, the Shamrock Murders stemmed from a personal dispute, none of the participants was an inducted member, the murders were not sanctioned, Riccardi obtained assistance from friends who were not in his crew, higher ups

considered killing Riccardi for his involvement, and the participants laid low after the murders.

Vernace makes too much of the similarities between his case and *Bruno*. For one, where it was understandable in *Bruno* that the defendant would violently retaliate for personal reasons against two individuals -- who sought to collect tens of thousands of dollars of loansharking debts from him and who he suspected had robbed him in the past -- the personal angle here is far weaker and not one the jury was obliged to credit. Further, even if the dispute at the Shamrock Bar was *initially* personal, it grew to be much more. For Vernace and Barlin, the spilled drink was not entirely personal: They were uninvolved; they were not there. We certainly did not hold in *Bruno* that a jury must find that *all* predicate acts with a personal dimension are unrelated to a charged RICO conspiracy.

As to the other factual similarities with *Bruno* that Vernace draws on, the jury could have rejected the weight that Vernace now assigns to that evidence. The fact that the three participants in the Shamrock Murders were only Gambino associates and not inducted soldiers was not dispositive. We look at the criminal activities in which alleged participants in the racketeering

enterprise engage, not merely the labels that the enterprise uses to describe them. *See United States v. Brady*, 26 F.3d 282, 289-90 (2d Cir. 1994) (holding that "significant criminal activity engaged in on behalf of the Family by associates" who were not "made members" could support RICO liability).  Likewise, the evidence that the murders were not sanctioned by the Gambino crime family, the family sought to discipline Riccardi, and Vernace went into hiding did not preclude a finding that the murders were related to the family's activities.  *See Bruno*, 383 F.3d at 84 (holding that predicate acts need not be "in furtherance of" the enterprise).  After all, *Vernace* was not punished for participating in the Shamrock Murders -- he was, indeed, ultimately entrusted with ruling authority.

Accordingly, the evidence here was sufficient to support a reasonable jury's conclusion that the Shamrock Murders were related to the Gambino crime family.

C.  *Heroin Distribution*

Vernace next argues that the evidence was insufficient for the jury to find that between January 1981 and May 1981 he distributed or conspired to distribute heroin or that such drug offenses related to the Gambino crime family. At trial, however, multiple witnesses testified that during this period "Ron and

Pepe" were supplying heroin. *E.g.*, App. at 321. Testimony showed that Vernace went by "Pepe." And a reasonable juror could have concluded that "Ron" was none other than Ronald Barlin, Vernace's partner from the Shamrock Murders. In fact, as Barlin and others were being arrested for possession of heroin, Vernace telephoned to check that everything was all right. Vernace's participation was further shown by testimony that he asked a dealer (Gleckler) to start dealing heroin. A reasonable jury could have concluded on this evidence that Vernace and his associates engaged in a heroin trafficking operation.

Vernace argues alternatively that any such activities were not related to the Gambino crime family because the family did not sanction, and indeed had rules against, drug dealing. He insists that any such activities were merely personal affairs. Vernace's challenge fails for much of the same reason that his challenge to the Shamrock Murders failed. We have consistently held that predicate acts need not be "in furtherance of" the racketeering enterprise to be related. *E.g.*, *Bruno*, 383 F.3d at 84; *Locascio*, 6 F.3d at 943. The Gambino crime family could have, by its internal rules, discouraged drug dealing, and still, as a factual matter, been engaged in it as part of its racketeering activities. Indeed, the jury heard evidence that this was the case here. Witnesses testified that the

- 20 -

Gambino crime family engaged widely in drug trafficking to generate money for themselves. The jury further heard that high-ranking Gambino members regularly distributed drugs, used other lower-ranked members to distribute drugs, or refused to enforce the so-called rule against drug dealing. It was therefore reasonable to conclude that, despite a facial prohibition on drug dealing, the Gambino crime family profited from it and Gambino members, including Vernace, regularly participated in it. Accordingly, a reasonable jury could have concluded that Vernace distributed and conspired to distribute heroin in relation to the Gambino crime family.[1]

## II.    *Section 924 Conviction*

Vernace next contends that he was convicted and sentenced under the wrong version of § 924(c), as a consequence of which, he argues, the mandatory minimum for his offense was increased and his sentence was required to be served consecutively. In 1981, when Vernace committed the Shamrock Murders, § 924(c) provided that using or unlawfully carrying a

---

[1]    We also reject Vernace's two other, related contentions. He argues that, because the evidence was insufficient on the Shamrock Murders and heroin distribution charges (1) there was prejudicial spillover into the additional charges and (2) the evidence was also insufficient to support a § 924(c) conviction. As described above, however, the evidence sufficiently demonstrated Vernace's participation in both the murders and the drug crimes, and it was likewise sufficient to demonstrate that Vernace discharged a weapon in the course of those murders.

firearm in relation to a felony was subject to imprisonment of not less than one nor more than ten years. *See* 18 U.S.C. § 924(c) (1976). A sentence was not required to be imposed consecutively. *See id.*; *see also United States v. Gaines*, 594 F.2d 541, 545-46 (6th Cir. 1979); *United States v. Sudduth*, 457 F.2d 1198, 1202 (10th Cir. 1972).[2]

As relevant here, those provisions of § 924(c) were amended first in 1984 to provide for mandatory consecutive sentencing. *See* Act of Oct. 12, 1984, Pub. L. No. 98-473, § 1005, 98 Stat. 1837, 2138-39 (codified as amended at 18 U.S.C. § 924(c)). In 1998, § 924(c) was amended once again to increase the mandatory minimum from one to ten years. *See* An Act to Throttle Criminal Use of Guns, Pub. L. No. 105-386, 112 Stat. 3469 (1998) (codified as amended at 18 U.S.C. § 924(c)(1)(A)(iii)) (providing that any person who "uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime . . . if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years").

---

[2] In 1981, § 924(c) provided in relevant part that "the term of imprisonment imposed" shall not "run concurrently with any term of imprisonment imposed for the commission of such felony" only "[i]n the case of [a] second or subsequent conviction under [§ 924(c)]." There was no restriction on concurrent sentences for first convictions.

In the proceedings below, the more recently amended version of § 924(c) was applied. Because Vernace never argued below that an earlier version of § 924(c) should have been utilized, assuming there was error, we review for plain error. *See United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010). We exercise our discretion to overturn a conviction only if (1) there is an error (2) that is clear or obvious, rather than subject to reasonable debate, (3) that was not harmless (and thus affected the defendant's substantial rights), and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Nouri*, 711 F.3d 129, 138 (2d Cir. 2013).

Here, even assuming there was error, Vernace does not meet the criteria under a plain error standard. First, the error was not clear or obvious. The district court proceeded entirely based on the post-1998 amended version of § 924(c). The indictment referenced the newly added subsections; the district court instructed the jury by reading this statutory language; the verdict sheet included the newly added element of "discharg[ing]" the firearm, which the jury then found; the Presentence Report relied on this version; and Vernace was ultimately convicted under this provision. Not once, however, did defense counsel object to using the amended version of the statute. Second, the error was

- 23 -

harmless.  Vernace is serving a life sentence independent of his sentence on Count Two, the § 924(c) count.  His Guidelines range was calculated, and his term of life imprisonment was imposed, irrespective of which version of § 924(c) applied.  Finally, we note that in his initial brief on appeal Vernace devotes only one footnote to the sentencing issue -- and that footnote consists of only two conclusory sentences.  Under all these circumstances, the error, assuming there was error, did not seriously affect the fairness, integrity, or public reputation of the proceedings.  Accordingly, we reject Vernace's challenge to his § 924(c) conviction.

## III.  *Newly Discovered Evidence*

Vernace finally contends that the Government's post-trial revelation about the cooperating witness's violation of his cooperation agreement for several years requires that Vernace be granted a new trial, as the newly discovered evidence would have discredited this witness's testimony.  We disagree.

We review a district court's denial of a motion for a new trial based on newly discovered evidence for abuse of discretion.  *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004); *United States v. Persico*, 645 F.3d 85, 109 (2d Cir. 2011)

(commenting that "[t]he motion is not favored" (quoting *United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir. 1981))).  District courts may grant a new trial if "(1) the evidence [is] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007).

There was no abuse of discretion here.  The trial testimony showed that the cooperator was a member of New York City's Bonanno crime family from the age of twelve until his incarceration decades later.  He testified as to participating in crimes for the Bonanno crime family and with the Gambino crime family.  Those crimes, as he acknowledged during direct and cross-examination, included illegal gambling, robbery, and dealing drugs.  More seriously, he planned and committed a murder to "level[] [his] game up"; the witness lured the victim to a social club and then shot him in the back of the head.  App. at 644.

The additional proposed evidence was merely cumulative or impeachment evidence.  The fact that the witness violated his cooperation

agreement by engaging in gambling once again could only have been used to further discredit him. In any event, the newly discovered evidence was essentially more of the same, as the witness had testified to a long history of illegal gambling through his association with the Bonanno crime family. Further, in view of his admission to a brutal murder, the new evidence that the witness was again engaging in illegal gambling could not have added much to Vernace's attempt to attack the witness's credibility. We accordingly affirm the district court's denial of Vernace's motion for a new trial.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.